[No. D027604. Fourth Dist., Div. One. Feb. 17, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
JERRY P. JENNINGS, Defendant and Appellant.

**[Opinion certified for partial publication.*]**

*This opinion is ordered certified for publication with the exception of parts II and III.

**COUNSEL**

Eric S. Multhaup, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Matthew C. Mulford, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**HUFFMAN, J.**—After a second jury trial,[1] Jerry P. Jennings was convicted of conspiracy to commit robbery based on true findings of 14 overt acts (Pen. Code,[2] § 182, subd. (a)(1)) and 4 second degree robberies (§ 211). The jury also found true allegations Jennings personally used a pellet gun in the commission of two of the robberies (§ 12022, subd. (b)). After a bifurcated trial, the court found true Jennings had suffered two serious felony prior convictions within the meaning of section 667, subdivision (a)(1), and also

---

[1] A mistrial was granted after the jury in Jennings's first trial could not reach any verdicts.
[2] All statutory references are to the Penal Code unless otherwise specified.

two strike priors (§§ 667, subds. (b)-(i), 1170.12).[3] It sentenced him to prison for a total term of 110 years to life, consisting of 4 consecutive 25-year-to-life terms for the robberies and 10 years for the section 667, subdivision (a)(1) enhancements. The court stayed punishment under section 654 for the conspiracy conviction and struck the punishment for the armed enhancements.

Jennings raises three issues on this appeal. First, he contends both the trial court and his trial counsel deprived him of his Sixth and Fourteenth Amendment rights to the effective assistance of counsel and to testify on his own behalf when neither acted to protect those rights when his counsel declared a conflict of interest at trial. He then asserts the court violated his right to due process and a fair trial by permitting the prosecution to "impeach" him with an unsanitized robbery conviction. Finally, he claims the case should be remanded for resentencing because the trial court operated under the erroneous assumption consecutive sentences were required under the three strikes law for his multiple current crimes committed on December 27, 1995. With the exception of a partial reversal of his sentence for a limited remand to allow the trial court to consider whether to exercise its discretion to impose concurrent or consecutive terms for the sentences imposed for two of the robberies, we affirm.

## FACTUAL SUMMARY

The sufficiency of the evidence to support the various convictions and findings is not challenged. We therefore sketch the basic facts presented to the jury at trial to provide a backdrop for our discussion. On December 14, 1995, about 5:00 p.m., two Black men wearing fake beards entered a mail service center in Fallbrook, California, and ordered four employees and one customer to the floor. The man carrying a semiautomatic handgun threw one employee to the ground when he did not immediately comply. The robbers escaped with several thousand dollars.

The robbers sped away in a red Nissan Sentra driven by a woman. When she pulled out of an alley near the mail center she narrowly missed hitting another car. The driver of that car followed her several blocks, watching her repeatedly look into the rearview mirror and noting the two Black male passengers changed their clothes. Suspicious, the driver took down the

---

[3]The three strikes law, enacted as urgency legislation on March 7, 1994, is set forth in section 667, subdivisions (b) through (i) (Stats. 1994, ch. 12) and the initiative version, Proposition 184, approved by the California voters on November 8, 1994, is set forth in section 1170.12. Our review of the two statutory schemes has revealed the provisions at issue here are virtually identical. Our reference to one section will thus necessarily pertain to the other in this opinion.

Nissan's license plate number and reported it to the sheriff's department. The red Nissan was traced to Alma Johnson, who lived in San Ysidro, California. Within a few days, a surveillance of Johnson's residence was set up by the police.

Jennings, who was Johnson's boyfriend, and the red Nissan were observed at Johnson's residence. On the morning of December 27, 1995, agents followed Jennings, Johnson and another man as they drove in the Nissan to a number of stores and thrift shops. The officers watched as they bought various items in El Cajon and La Mesa, including clothing, fake beards, mustaches, latex gloves, small bottles of liquid, and face makeup. The three then drove onto Interstate Highway 15 and headed north toward Riverside County. At that point both Jennings and the other man were observed to be clean shaven. When they were seen in Riverside County, both men had on fake beards. The agents watched as the three drove slowly past several stores and shopping complexes there. They lost sight of the Nissan around 7:30 p.m.

About 9:30 p.m. that same evening, Jennings and the other man wore gloves and fake beards as they entered the Subway Sandwich Shop in Menifee, Riverside County, and approached employees Sheila Delgado and Christy Hernandez with a semiautomatic pistol and metal object, demanding money from the cash register and safe. Jennings and his cohort left the shop with money from both the register and a cash box.

Later, about 10:15 p.m., Jennings and the other man, armed and wearing fake beards, entered the back of a closed Chinese restaurant in Murrieta, Riverside County, and surprised the owner and three employees as they ate dinner. The robbers knocked one of the employees unconscious before leaving the restaurant with $145 from the cash register.

The next day, the police searched Johnson's residence and found a black pellet gun which resembled a semiautomatic handgun. Johnson and Jennings were both arrested. After being transported to the police central headquarters, Jennings initially invoked his *Miranda*[4] rights and denied knowing anything about a December 14th Fallbrook robbery.

Shortly thereafter, Jennings told an officer he wanted to talk with Detective John Simms. Jennings indicated he would talk with Simms about the robberies if he could first talk with Johnson. After briefly speaking with Johnson, Jennings waived his *Miranda* rights and talked with Simms. During

---

[4]*Miranda* v. *Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694, 10 A.L.R.3d 974].

the taped interview, Jennings admitted committing the Fallbrook, Menifee and Murrieta robberies with another man while Johnson drove the Nissan. Jennings also admitted he carried a gun during the robberies.

An employee and a customer of the mail center robbery identified Jennings as the perpetrator from both a photographic lineup and at trial. Only one of the sandwich shop employees indicated at trial that Jennings resembled one of the robbers. The owner of the Chinese restaurant could not identify Jennings as one of the robbers by photographic lineup or in court.

Johnson, who was facing prosecution for the same charges as Jennings in addition to another unrelated robbery, testified she drove the Nissan while Jennings and another man committed the robberies at the various locations. She and Jennings had earlier purchased the pellet gun to commit the robberies. Although the prosecutor had not promised her a reduced sentence, Johnson hoped to receive leniency in exchange for her testimony and cooperation. Her bail was lowered after she signed the agreement to testify against Jennings and she was out of custody at the time she testified pending her own trial two days later.

Jennings then testified on his own behalf. He confirmed he had initially invoked his *Miranda* rights and denied knowledge of a Fallbrook robbery before he heard Johnson's voice coming from another room at the police department after their arrest. He asked to speak with Simms, who allowed him to speak briefly with Johnson. Jennings claimed he told Johnson he was going to take the blame so she could go home. He then agreed to talk with Simms about the robberies and waived his earlier invoked *Miranda* rights. He spoke with Simms because he was promised Johnson would go free.

On cross-examination, Jennings acknowledged he admitted to Simms he committed the robberies, but claimed he did so only to cover up for Johnson. At trial, he denied he committed any of the robberies. He stated another person told him about the details of the crimes. Although ordered by the court to do so, Jennings would not identify the person who was responsible for the mail center robbery, the friend whose house he was at during the commission of the December 27th robberies or the location of that house. Jennings said he attempted to minimize Johnson's involvement when he talked with Simms. He also admitted he had previously been convicted of robbery and burglary.

DISCUSSION

I

*Right to Counsel and Right to Testify*

Before the defense case, out of the jurors' presence and after an unreported chambers conference, counsel apprised the court that Jennings had decided to exercise his right to testify on his own behalf. Counsel stated he had told Jennings there were "certain ethical conflicts and considerations which have arisen as a result of . . . having talked to him about his case[,] and some of those conflicts would compromise [counsel's] ability to ask him certain types of questions which may [*sic*] assist him in his defense." Counsel felt compelled by case law to bring the matter to the court's attention and also to make a record that he had fully explained the situation to Jennings, that Jennings indicated he understood and had decided to "go forward knowing that I am limited in the scope of my direct examination of him."

The following colloquy then occurred:

"THE COURT: Well, you stated this, and Mr. Jennings is here. I am sure you have talked to him. And obviously if he had any questions, I guess he would raise them. "[DEFENSE COUNSEL]: Well, I think the court should inquire as to [everything] I have stated as accurate just so—

"THE COURT: I don't think I am in a position to ask Mr. Jennings anything. If—in other words, Mr. Jennings has heard and you have explained without going into the details of anything, which would be improper clearly. And . . . you have explained the legal and ethical situation, and you told us you have talked to him about it and explained it, as I am sure in more detail because you could go over the facts with him. And he has heard what you had to say and, you know, if he has any questions, now would be the time to raise them. And I take it that he doesn't—he is not saying anything. And so I don't . . . feel that it would be appropriate for me to make any inquiries of Mr. Jennings. I don't know what I would ask him in the first place; so it's his right to testify or not testify and you have explained that. And he obviously knows because the last time [at the first trial] he didn't."

After briefly addressing another matter, the discussion returned to counsel's representations, with the prosecutor asking that the record reflect that "[i]mplicit in [counsel's] representation . . . is that further elaboration as to what the nature of the conflict that may have . . . been created with the

defendant . . . would violate the attorney-client privilege." The prosecutor requested the record be "a little bit more explicit since more detailed reasons have not been given." The court declined to have more put on the record, stating "any further details about it would clearly violate the—would appear to me, and I don't know what more he can say. I know what more I would want—I expect him to say, shall we say, and so I am ready to proceed now."

Defense counsel then called Jennings to the stand, asking him questions about the circumstances surrounding his confession. The gist of his direct testimony was that he only confessed to having committed the robberies because the police had assured him they would release his girlfriend. During extensive cross-examination, he denied committing the robberies and continued to claim he only confessed to the crimes to protect "somebody [he] thought [he] cared for, and [he] thought cared for [him.]" Jennings twice refused to comply with court orders to identify a person involved in the mail center crime and the address he had supposedly been dropped off at before the December 27, 1995, robberies.

■ Jennings now complains he was denied the effective assistance of counsel at trial because the trial court abdicated its responsibility to inquire into defense counsel's asserted "ethical conflicts" and to take appropriate remedial measures, such as warning him of the dangers and disadvantages of proceeding without the full assistance of counsel, and his trial counsel failed to protect him from the adverse consequences of declaring an ethical conflict by making a motion to withdraw as counsel.

The parties essentially agree that although criminal defendants have both an absolute right to testify in their own defense and to have the right of counsel free from conflicts of interest (see *Nix* v. *Whiteside* (1986) 475 U.S. 157, 164 [106 S.Ct. 988, 992-993, 89 L.Ed.2d 123]; *Wood* v. *Georgia* (1981) 450 U.S. 261, 271 [101 S.Ct. 1097, 1103, 67 L.Ed.2d 220]; *People* v. *Bonin* (1989) 47 Cal.3d 808, 834 [254 Cal.Rptr. 298, 765 P.2d 460]; *People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710]), a conflict created by a defendant's desire to commit perjury is not subject to the same analysis as that used in multiple representation conflict cases. (*Nix* v. *Whiteside, supra,* 475 U.S. at p. 176 [106 S.Ct. at p. 999].) Jennings, however, premises his numerous arguments in support of finding he was denied the right to counsel on the impossibility of knowing from the state of this record just what the nature of trial counsel's asserted "ethical conflicts" were that arose from his communications with him. Relying on the part of the record where the prosecutor noted without comment that the conflict apparently concerned attorney-client communications, the People posit the only realistic possible ethical conflict was that trial counsel feared Jennings would perjure himself through his testimony.

This court addressed a somewhat similar situation in *People* v. *Johnson* (1998) 62 Cal.App.4th 608 [72 Cal.Rptr.2d 805]. In that case, trial counsel had "referred only to having an 'ethical conflict' about calling [the defendant] as a witness and never stated he believed [the defendant] would commit perjury." (*Id.* at p. 618, fn. 6.) Because the defendant was not able to suggest any other ethical conflict which might have prevented his attorney from calling him as a witness, we proceeded to address the issue of the defendant's constitutional right to testify assuming the trial court ruled with such basis in mind. (*Ibid.*) Although Jennings does suggest another matter which might have prevented his attorney from asking him certain questions, i.e., counsel's possible loyalty to another current or former client, his suggestion is pure speculation.

Based on this speculation, appellate counsel has set out arguments generally addressed when a defense counsel actively represents more than one defendant or multiple clients with competing interests. (*Wood* v. *Georgia, supra,* 450 U.S. at p. 272 [101 S.Ct. at pp. 1103-1104]; *People* v. *Bonin, supra,* 47 Cal.3d at pp. 835-836.) In such cases, the court has an affirmative duty to take steps to protect a defendant's rights and inquire into and give the defendant advice on the matter. (*Ibid.*) Although the duty to investigate further into conflicts does not generally apply to those created by the fear of perjury (*Nix* v. *Whiteside, supra,* 475 U.S. at p. 176 [106 S.Ct. at p. 999]), we believe a trial court should inquire into the matter in more depth than reflected on this record. Our quandry, however, is that the matter was initially discussed in an unreported chambers conference before it was raised on the record before us. Thus, the extent to which the court actually delved into the ethical conflict raised by Jennings's counsel is unknown. What the record reflects is that the court and prosecutor treated the matter as one where counsel feared Jennings would testify falsely if asked certain questions. Counsel informed the court he had explained such conflict to Jennings, that Jennings understood it and the dangers of limited questioning, and agreed to proceed under such conditions. From this record we presume, as we did in *Johnson,* that counsel feared Jennings would commit perjury if asked certain questions.

As the parties recognize, a defense attorney has an ethical obligation not to present perjured testimony (*People* v. *Johnson, supra,* 62 Cal.App.4th at pp. 618-620; Bus. & Prof. Code, § 6077; Rules Prof. Conduct, rule 5-200) and the attorney's refusal to participate in such presentation does not deny the client effective assistance of counsel. (*Nix* v. *Whiteside, supra,* 475 U.S. at p. 171 [106 S.Ct. at p. 996]; *People* v. *Gadson* (1993) 19 Cal.App.4th 1700, 1710 [24 Cal.Rptr.2d 219].) In *Johnson,* we explained various options a defense attorney faces when confronted with the dilemma of a client

possibly falsely testifying. (*People* v. *Johnson*, *supra*, 62 Cal.App.4th at pp. 620-630.) In addition to noting an attorney should first try to persuade the client to testify truthfully, we also noted a defense counsel may notify the court of the conflict, may move to withdraw from representation, may allow the client to testify in narrative form, may persuade the client not to testify or may remain silent in complicity with the client's false testimony. (*Ibid.*)

Here, defense counsel appears to have believed he had persuaded Jennings to testify truthfully to the limited questions he was asking on direct examination. Counsel chose this solution to the conflict dilemma and represented to the court that Jennings agreed with such solution. While we would have preferred the court inquire personally of Jennings as to his understanding and agreement with counsel's representations, we cannot find the failure to do so prejudicial on this record.

Although we determined in *Johnson* that "the narrative approach best accommodates the competing interests of the defendant's constitutional right to testify and the attorney's ethical obligations" (*People* v. *Johnson*, *supra*, 62 Cal.App.4th at p. 630), such is clearly not the only approach available under all circumstances that will accomodate those rights. (*Id.* at pp. 620-630.) Nor do we think trial counsel was required to make a motion to withdraw as attorney for Jennings. We presume counsel might have chosen such as the preferable option if he knew Jennings would not testify truthfully at all. (See *People* v. *Brown* (1988) 203 Cal.App.3d 1335, 1339-1340, fn. 1 [250 Cal.Rptr. 762].) We thus assume counsel considered the alternatives, chose the one he could ethically live with and discussed the matter with Jennings before Jennings decided to testify with limited questioning.

At no time during this second trial did Jennings personally complain about his attorney's performance. Nor did he question the conflict matter when the court stated Jennings could express something about it if he so desired. Faced with this record, we believe the Attorney General's characterization of the limited direct examination of Jennings by defense counsel as a tactical choice agreed upon by both client and attorney is an accurate description.[5] As our Supreme Court in *People* v. *Musselwhite* (1998) 17 Cal.4th 1216 [74 Cal.Rptr.2d 212, 954 P.2d 475] recently reiterated: "[A] reviewing court may not retrospectively second-guess defense counsel's tactical decisions made in the stress of trial. Indeed, . . . ' "[i]n order to demonstrate

[5]In *Johnson*, the attorney made clear on the record his ethical conflict was more than a trial tactic not to have the defendant testify, and we subsequently held the court erred in precluding Johnson from testifying. (*People* v. *Johnson*, *supra*, 62 Cal.App.4th at pp. 613-614, 636.) Here, counsel did not so limit his solution to his disclosed conflict. Nor was Jennings precluded from testifying with the assistance of his counsel.

ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because 'his representation fell below an objective standard of reasonableness . . . under prevailing professional norms.' [Citation.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citations.] Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" ' [Citations.]" (*Id.* at pp. 1259-1260.)

■ Jennings nevertheless argues that under the circumstances here his attorney's decision to question him only on certain matters, while avoiding others that might have helped his defense, was a tactical decision no attorney would make and which essentially left him without counsel to prepare him for cross-examination and without counsel to rehabilitate him on redirect or in closing argument. He also asserts the usual analysis for ineffective assistance of counsel does not apply here because his counsel conceded on the record there was a conflict and such prevented him from full vigorous representation. Jennings misreads the record. Counsel only stated the questions he would not ask Jennings because of the ethical conflict "may" have assisted Jennings in his defense. Such speculative assessment by trial counsel does not provide actual prejudice as Jennings now claims. Further, Jennings's claims of lack of preparation and representation by his counsel cannot be fully reached on this record. ■ Generally, "in assessing [a constitutional] attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People* v. *Musselwhite*, *supra*, 17 Cal.4th at p. 1260, original italics.) ■ On this record, we cannot say such standard is met. We presume defense counsel possessed a knowledgeable understanding of both the relevant legal principles and the factual and strategic circumstances surrounding the case and the ethical dilemma he faced and acted within the wide range of reasonable professional assistance. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 689 [104 S.Ct. 2052, 2065, 80 L.Ed.2d 674].)

■ Moreover, as it has repeatedly been stressed, " '[if] the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation,' the claim on appeal must be rejected." (*People* v. *Wilson* (1992) 3 Cal.4th 926, 936 [13 Cal.Rptr.2d 259, 838 P.2d 1212], quoting *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].) Our Supreme Court in *People* v. *Mendoza Tello* (1997) 15 Cal.4th 264 [62

Cal.Rptr.2d 437, 933 P.2d 1134] noted that claims of inadequacy of counsel in such cases are more appropriately decided in a habeas corpus proceeding. (*Id.* at pp. 266-267.) ▉▉▉ Because the record here does not explain why Jennings's counsel acted or failed to act in the manner challenged, i.e., it does not reflect the discussions between attorney and court in the chambers conference regarding the ethical conflict matter nor those between attorney and Jennings regarding trial strategy, we are hesitant to find trial counsel incompetent without development of all the relevant facts.

Further, any prejudice on this record is purely speculative. Jennings has simply not shown how his testimony would have been any different without trial counsel or how a narrative form of his story would have changed the result of his trial. On this record, no ineffective assistance of counsel has been shown.

## II, III*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is reversed with respect to the imposition of consecutive sentences on counts 2 and 3 and the matter is remanded for further proceedings consistent with the views expressed in this opinion. In all other respects, the judgment is affirmed.

Kremer, P. J., and Reed, J.,† concurred.

Appellant's petition for review by the Supreme Court was denied June 3, 1999.

---

*See footnote, *ante,* page 899.

†Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.