52 Cal.Rptr.3d 31 (2006)
145 Cal.App.4th 820
In re Ny NOURN on Habeas Corpus.
No. D046347.
Court of Appeal of California, Fourth District, Division One.
December 14, 2006.
*33 Patricia J. Ulibarri, San Diego, under appointment by the Court of Appeal, for Petitioner.
Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Meagan J. Beale and Kyle *34 Niki Shaffer, Deputy Attorneys General, for Respondent.
McDONALD, J.
Ny Nourn filed a petition for writ of habeas corpus challenging the judgment entered after a jury convicted her of the first degree murder of David Stevens (Pen.Code, §§ 187, subd. (a), 189) and arson (Pen.Code, § 451, subd. (d)). Her petition asserts that because her defense counsel did not investigate the existence of, and present evidence on, battered women's syndrome (BWS),[1] she was denied her constitutional right to effective assistance of counsel. We conclude the performance of Nourn's defense counsel was below the applicable standard of objective reasonableness and resulted in prejudice to Nourn.

FACTUAL AND PROCEDURAL BACKGROUND[2]

I. People's Case

A. Discovery of Stevens's Body and Ensuing Investigation

In the predawn hours of December 23, 1998, a La Jolla resident heard an explosion and saw a fire on La Jolla Scenic Drive near Ardath Road. Firefighters responded to her 911 call and discovered a vehicle engulfed in flames. A body was in the front passenger seat; a forensic dentist identified the victim as Stevens.
An autopsy revealed that Stevens had been shot twice in the head before his body was burned. One of the shots was fired from a distance of about one-half inch. Each of the gunshot wounds would have been fatal.
Police officers searched Stevens's apartment. The security system recorded that someone had been "buzzed in" to his apartment at 3:05 a.m. on the day of his death. A call had been placed from Nourn's number to Stevens's apartment during the early morning of December 22, 1998. Several fingerprints identified as Nourn's were found in Stevens's apartment, including some on the headboard of his bed. Nourn's DNA was also discovered on a mug found in Stevens's apartment.
An expert testified the car fire had been started in the passenger's side of the vehicle and had been caused by the ignition of combustible materials.
On the Monday following Stevens's death, the employees of Perfect Match, a dating service at which Nourn worked for Stevens, were informed of Stevens's death. Nourn began crying and ran from the room. She never returned to Perfect Match and never picked up her final paycheck.

B. Nourn's Confession

The case was unresolved for three years. However, in November 2001 Nourn contacted *35 the San Diego Police Department and confessed her role in Stevens's murder. The following description of the events leading to the murder is from Nourn's transcribed confession.
In August 1998, when Nourn was 17 years old, she met Ronald Barker, then a 34-year-old married man with a child, through the Internet. Three days after they met online, they had a date and had sex.
Nourn's relationship with Barker continued through the Fall of 1998. In November 1998, Nourn began working at the Perfect Match dating service. She developed a friendly relationship with her boss, Stevens. Nourn liked Stevens and thought he was "real cute." On the evening of December 22, Nourn went on a date with him. They went to Stevens's apartment and had sex.
After leaving Stevens's apartment that night, Nourn returned to her home. When she arrived, she saw Barker's car parked near her house. She became "nervous, ... shaking because [she] knew ... that [she] was in big trouble." She parked behind Barker's car and walked to it. Barker asked Nourn where she had been. At first she said she had been shopping at Wal-Mart. Barker did not believe her and Nourn admitted that she had "slept with [her] boss." Barker became angry and told her to get out of the car. Nourn said she was sorry and that it would never happen again. She then told Barker that she had been coaxed into having sex with Stevens, and then that he had raped her.
Barker replied, "I'm gonna kill him." Barker said that Nourn had been "violated" and was "used goods." He told Nourn to take him to Stevens's apartment so that he could confront him, and Nourn agreed to do so.
On their way to Stevens's apartment, Barker and Nourn stopped and had sex in the back seat of his car. Afterward, Barker suggested that he and Nourn should end their relationship. Nourn begged him not to do so, and he responded that the "[o]nly way you stay with me is if you kill David or I kill David." Nourn replied, "I do anything you say." Barker then stated that he needed to go to his house to get his gun, and Nourn followed him there.
Barker then told Nourn to call Stevens and tell him that she was stranded on the freeway. However, when Nourn called, Stevens did not answer. Barker and Nourn then drove to Stevens's apartment.
They planned to have Nourn tell Stevens that Nourn's car had broken down and ask him for a ride to get help. Barker would follow in his vehicle and when he flashed his headlights, Nourn would have Stevens pull over. They would tell Stevens that Barker was Nourn's brother.
When they arrived at Stevens's apartment, Nourn called him on the intercom and told him she needed help with her car. When Stevens came out, he and Nourn left in his car and traveled eastbound on Highway 52. Barker followed in his own car.
Barker flashed his lights and Nourn told Stevens to pull over. She told Stevens that she thought the person following them was her brother. Nourn walked to Barker's car and he told her to have Stevens follow him. Nourn returned to Stevens's car and told him to follow Barker. They drove to a residential area and then stopped. Nourn introduced Barker to Stevens as her brother. They then all got into Stevens's car, with Barker in the back seat.
Barker directed Stevens to drive, on the pretense of looking for Nourn's car. Nourn did not say much and "just kept to *36 [her]self." Barker then directed Stevens to pull over on Kearny Villa Road.
After Stevens pulled over, he asked, "Where's the car?" Barker grabbed Stevens by the neck and pointed the gun at his head. Barker said, "How does it feel to sleep with someone's girlfriend?" Stevens replied, "[D]on't do this," and Nourn said, "No, no." Barker shot Stevens in the head.
Barker pushed Stevens's body into the passenger's side of the car, told Nourn to get in the back, and drove away. Barker told Nourn, "You tell no one about this." Nourn asked what they were going to do next, and Barker replied, `We're gonna burn his body so we leave no evidence." They returned to Barker's car and drove off, with Barker driving Stevens's car and Nourn following in Barker's car. They stopped at a gas station near Barker's house and bought some gasoline, then drove to La Jolla Scenic Drive and parked. Barker poured gasoline into the car and onto Stevens's body, then set the car on fire. During the entire time, Nourn "just did what [Barker] told me."
They left in Barker's car. As Barker was driving Nourn home he said, "This is gonna be on the news. If any cops call you, say you don't know anything." The following day, Barker and Nourn went to a drive-in movie. Once there, Barker told Nourn, "You're not gonna tell anyone about this, right? You're mine forever and now that I've done this for you then you're clean as in your sin has gone away." Nourn told Barker that she loved him and they had sex in the back seat of the car. Barker told Nourn that if she told anyone, he would kill her. During the following three years, Barker and Nourn's relationship continued and neither told anyone about Stevens's murder. Nourn stated that she went along with the plan because she thought that Barker would kill her if she did not.

II. Defense Case

Nourn did not testify and presented no evidence in her defense.

III. Closing Arguments

In closing, the prosecutor argued Nourn was guilty of first degree murder based solely on the accomplice theory that she aided and abetted Barker's assault on Stevens and that Barker's murder of Stevens was a natural and probable consequence of that assault. The prosecutor argued: "This is an aiding and abetting case. There's no way around that. This is what it is. [¶] ... [¶] ... [T]he intent that Ny Nourn had was the intent to aid, facilitate or instigate the assault on David Stevens, the natural and probable [consequence] of which was his death." The prosecutor elaborated:
"... Nourn intended to facilitate the assault by what she did; she aided, assisted in, frankly, instigated the assault. All of those things show that she aided and abetted the assault. That is the intent that is required. No other intent is required. She didn't have to foresee all of these possible consequences. She didn't have to intend all of the possible consequences. She had to intend to facilitate, to aid the assault."
The prosecutor also argued that Nourn was guilty of arson because she aided and abetted Barker's commission of arson.[3]
*37 In closing, Nourn's counsel argued she did not intend to either kill or assault Stevens. He argued that Nourn acted "almost robotic" and just did what Barker said, without any intent to harm Stevens. He argued Nourn did not act "with the specific intent to commit the assault, or to aid and facilitate or instigate the commission of this crime, but it is merely a reaction to the crime that has been committed against her...." He argued that "Barker abused, controlled and manipulated [Nourn's] behavior." He also argued that Nourn did not have the intent to assist the arson, but again was just acting "roboticlike" in doing what Barker told her to do.
After the closing argument of Nourn's counsel, outside of the jury's presence, the prosecutor requested the court admonish the jury that duress is not a defense to murder. The prosecutor noted Nourn's counsel argued in closing that Nourn acted only because she had just been raped and was then in fear of Barker's behavior. The trial court agreed that duress was not available as a defense to murder. The court found that because Nourn's counsel had argued Nourn acted under duress because of her fear of Barker "smacking her and raping her," it would give the prosecutor's requested instruction. Accordingly, in instructing the jury, the court admonished the jury that duress was not a defense to the charge of murder.[4]

IV. Verdict and Judgment

The jury found Nourn guilty of premeditated murder and found true the special circumstance allegation that the murder was committed while lying in wait. The jury also found Nourn guilty of arson. The trial court sentenced Nourn to life without the possibility of parole for her murder conviction and to a consecutive three-year term for her arson conviction.

V. Appeal

On appeal from the judgment, in Nourn we reversed the jury's true finding on the special circumstance allegation, concluding the trial court prejudicially erred in instructing the jury on that allegation. (Nourn, supra, at p. 12.) In all other respects, we affirmed the judgment. (Nourn, supra, at p. 20.)
On February 18, 2005, on remittitur the trial court struck the special circumstance allegation after the prosecutor informed the court that allegation would not be pursued. Accordingly, the trial court sentenced Nourn to life with the possibility of parole for her murder conviction and to a consecutive term of three years for her arson conviction (as it had previously imposed).

VI. Petitions for Writ of Habeas Corpus

On February 22, 2005, Nourn filed a petition for writ of habeas corpus with the *38 trial court, asserting she was denied her constitutional right to effective assistance of counsel. On April 18, the trial court denied her petition.
On May 3, Nourn filed the instant petition for writ of habeas corpus with this court, asserting she was denied her constitutional right to effective assistance of counsel. On July 20, after the People filed an informal response to the petition, we granted an order to show cause why the relief requested by the petition should not be granted. Counsel was appointed for Nourn and directed to file an amended petition. Nourn's appointed counsel filed an amended petition and an appendix. The People thereafter filed a return, and Nourn's counsel filed a traverse.

DISCUSSION

I

Constitutional Right to Effective Assistance of Counsel
A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; Strickland v. Washington (1984) 466 U.S. 668, 684-685, 104 S.Ct. 2052, 80 L.Ed.2d 674; People v. Pope (1979) 23 Cal.3d 412, 422, 152 Cal.Rptr. 732, 590 P.2d 859, disapproved on another ground by People v. Berryman (1993) 6 Cal.4th 1048, 1081, fn. 10, 25 Cal.Rptr.2d 867, 864 P.2d 40.) To show denial of effective assistance of counsel, a defendant must show: (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defendant. (Strickland, supra, at pp. 687, 691-692, 104 S.Ct. 2052; People v. Ledesma (1987) 43 Cal.3d 171, 216-217, 233 Cal.Rptr. 404, 729 P.2d 839; Pope, supra, at p. 425, 152 Cal. Rptr. 732, 590 P.2d 859.) To show prejudice, a defendant must show there is a reasonable probability he or she would have received a more favorable result had counsel's performance not been deficient. (Strickland, supra, at pp. 693-694, 104 S.Ct. 2052; Ledesma, supra, at pp. 217-218, 233 Cal.Rptr. 404, 729 P.2d 839.) "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." (Strickland, supra, at p. 695, 104 S.Ct. 2052.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (People v. Williams (1997) 16 Cal.4th 153, 215, 66 Cal.Rptr.2d 123, 940 P.2d 710.) It is the defendant's burden on appeal to show he or she was denied effective assistance of counsel and is entitled to relief. (Ledesma, supra, at p. 218, 233 Cal.Rptr. 404, 729 P.2d 839.) "[T]he burden of proof that the defendant must meet in order to establish his [or her] entitlement to relief on an ineffective-assistance claim is preponderance of the evidence. [Citation.]" (Ibid.)
"In evaluating a defendant's claim of deficient performance by counsel, there is a `strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' [citations], and we accord great deference to counsel's tactical decisions. [Citations.] ... Accordingly, a reviewing court will reverse a conviction on the ground of inadequate counsel `only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his [or her] act or omission.' [Citations.]" (People v. Frye (1998) 18 Cal.4th 894, 979-980, 77 Cal.Rptr.2d 25, 959 P.2d 183.)
With effective assistance of counsel, "the defendant can reasonably expect that in the course of representation his [or her] counsel will undertake only those actions *39 that a reasonably competent attorney would undertake. But [the defendant] can also reasonably expect that before counsel undertakes to act at all he [or she] will make a rational and informed decision on strategy and tactics founded on adequate investigation and preparation. [Citations.] If counsel fails to make such a decision, [that] actionno matter how unobjectionable in the abstractis professionally deficient. [Citations.]" (People v. Ledesma, supra, 43 Cal.3d at p. 215, 233 Cal.Rptr. 404, 729 P.2d 839.) Criminal defense counsel has the duty to investigate carefully all defenses of fact and of law that may be available to the defendant. (In re Williams (1969) 1 Cal.3d 168, 175, 81 Cal. Rptr. 784, 460 P.2d 984.) "[T]o render reasonably competent assistance, an attorney bears certain basic responsibilities, including the investigation of available defenses and, in an appropriate case, the obtaining of a psychiatric examination. [Citation.]" (People v. Frierson (1979) 25 Cal.3d 142, 160-161, 158 Cal.Rptr. 281, 599 P.2d 587, italics added.) "If counsel's failure to perform these obligations results in the withdrawal of a crucial or potentially meritorious defense, `"the defendant has not had the assistance to which he [or she] is entitled."' [Citation.]"[5] (People v. Pope, supra, 23 Cal.3d at p. 425, 152 Cal. Rptr. 732, 590 P.2d 859, fn. omitted.) "[Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (Strickland v. Washington, supra, 466 U.S. at p. 690-691, 104 S.Ct. 2052.)
We "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." (Strickland v. Washington, supra, 466 U.S. at p. 690, 104 S.Ct. 2052.) Furthermore, we consider the seriousness of the charges against the defendant in assessing counsel's performance. (In re Jones (1996) 13 Cal.4th 552, 566, 54 Cal.Rptr.2d 52, 917 P.2d 1175.)

II

Admissibility of BWS Evidence Generally
"The theory of the `battered woman syndrome' originated in the works of psychologist Lenore Walker. [Citations.] Dr. Walker relied on the psychological concept of `learned helplessness,' under which an animal, or person, repeatedly unable to protect itself against injury, eventually learns that resistance is useless and becomes passive and despondent. [Citations.]" (People v. Brown (2004) 33 Cal.4th 892, 899, 16 Cal.Rptr.3d 447, 94 P.3d 574, fn. omitted.) "Battered women's syndrome `has been defined as "a series of common characteristics that appear in women who are abused physically and psychologically over an extended period of time by the dominant male figure in their lives." [Citations.]' [Citations.]" (People v. Humphrey (1996) 13 Cal.4th 1073, 1083-1084, 56 Cal.Rptr.2d 142, 921 P.2d 1.) BWS has also been described as "`a pattern of psychological symptoms that develop after somebody has lived in a battering relationship.'" (People v. Arts (1989) 215 Cal.App.3d 1178, 1194, 264 Cal.Rptr. 167, *40 disapproved on another ground in People v. Humphrey, supra, at p. 1086, 56 Cal. Rptr.2d 142, 921 P.2d 1.) The expert witness in Brown testified:
"The `cycle of violence' in an abusive domestic relationship ... does not necessarily begin with physical abuse. Most abusive relationships begin with a struggle for power and control between the abuser and the victim that later escalates to physical abuse. The initial `tension building stage' of the cycle can appear in deceptively mundane ways, such as complaints about the cleanliness of the house. Often the abuser uses psychological, emotional, or verbal abuse to control the victim. When the victim tries to leave or to assert control over the situation, the abuser may turn to violence as an attempt to maintain control. Later, even if there has been no other episode of violence, the victim may change her mind about prosecuting the abuser and may recant her previous statements." (People v. Brown, supra, 33 Cal.4th at p. 907, 16 Cal.Rptr.3d 447, 94 P.3d 574.)
In general, "all relevant evidence is admissible." (Evid.Code, § 351.)[6] "`Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.)
Expert testimony on BWS is admissible if relevant to prove or disprove a disputed issue. (§§ 210, 351; People v. Gadlin (2000) 78 Cal.App.4th 587, 592, 92 Cal. Rptr.2d 890.) Section. 1107 specifically provides for the admissibility of certain expert testimony on BWS:
"(a) In a criminal case, expert testimony is admissible by either the prosecution or the defense regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge.
"(b) The foundation shall be sufficient for admission of this expert testimony if the proponent of the evidence establishes its relevancy and the proper qualifications of the expert witness...." (Italics added.)
Furthermore, section 801 provides for the admissibility of expert testimony that may assist the trier of fact.[7] That statute allows the admission of relevant expert testimony on BWS apart from the provisions of section 1107. (People v. Brown, supra, 33 Cal.4th at pp. 895-896, 905-907, 16 Cal. Rptr.3d 447, 94 P.3d 574; People v. Humphrey, supra, 13 Cal.4th at p. 1088, 56 Cal.Rptr.2d 142, 921 P.2d 1.)

*41 III

Nourn's Amended Petition for Writ of Habeas Corpus
Nourn's amended petition for writ of habeas corpus asserts that because her defense counsel did not investigate the existence of and present evidence on BWS, she was denied her constitutional right to effective assistance of counsel.

A
The appendix to Nourn's amended petition includes: (1) the declarations and/or reports of four expert psychologists concluding Nourn suffered from BWS; (2) the declaration of Nourn's trial counsel, Bruce Cormicle, explaining his actions before and during trial; and (3) the declarations of six attorneys in support of Nourn's petition. Although the details of those documents are important to fully understand Nourn's contentions, for purposes of this opinion we describe only the more salient portions of those documents.
1. Dr. Friedman. Psychologist Meredith Friedman's declaration attached a copy of her 14-page psychological evaluation (or forensic examination) of Nourn conducted in November 2004.[8] Dr. Friedman interviewed Nourn on two occasions and administered various psychological tests. Dr. Friedman's report noted that Nourn is Cambodian, but was born in Thailand, to which her mother had fled as a refugee. Nourn's father left her mother when Nourn was an infant. When Nourn was six years old, she immigrated with her mother to Florida. About one year later, they moved to San Diego, where her mother met and married Nourn's stepfather, who is Vietnamese and Cambodian. Nourn has a younger half-brother and half-sister from her mother's marriage to her stepfather. Her parents fought frequently over family matters, money, and Nourn's behavior. Her stepfather sometimes hit her mother, who would try to fight back in self-defense. Her mother suffered bruises and bleeding from her stepfather's attacks. Nourn told Dr. Friedman: "`He [i.e., her stepfather] had a short temper and my mother was submissive to him. He was abusive to her until I left at [age] 18 but I saw that it got less over the years.' ... `We were all scared of my father.'"
Her mother was strict and overprotective, prohibiting her from playing outside. Her mother disciplined her by hitting her with a tree branch or an appliance cord. Nourn did not have a "real loving or close" relationship with either her mother or stepfather. Nourn's mother accused her of having an affair with her stepfather when she was in high school, but Nourn told Dr. Friedman that it was not true. Barker was Nourn's 13th sexual partner and 12th man she met on the Internet. After their first date, Nourn and Barker began seeing each other daily. Barker was very secretive about his life and age. He told her his name was Brandon. Barker was Vietnamese. He told her he was rich and lived with his mother in La Jolla. He was very jealous and controlling. Barker told her she could not leave him until he said so or he would kill her. She was to obey Barker and not ask questions about his life. He said that he was in the Mafia. He said he had killed other girlfriends. Nourn said she was afraid of Barker, but he told her he would protect *42 her. Although he would raise his hand as if he were going to hit her, he never hit her until the night of Stevens's killing. Barker was a con man who involved Nourn in a scam, obtaining (apparently fraudulently) a credit card in her stepfather's name. In November 1998, Nourn got a job at a restaurant. Nourn had to obtain Barker's permission to do anything and let him know before she did it. He told her he had people spying on her. He picked her up after work. He accused her of having sex with her restaurant boss. Nourn told Dr. Friedman: "I was unhappy with my relationship with [Barker], but I was scared to leave him. He had shown me a gun, and I had to get him a copy of my house keys so he could come by and check on me at night since my parents would be delivering newspapers [then]." Nourn told Dr. Friedman that the night of the incident, she led Barker to Stevens's apartment because she was "scared [Barker] was going to hit me if I didn't do what he said." After Barker shot Stevens, Barker told her "he'd kill me if I didn't help him burn the body." After the incident, Barker told her that if she ever tried to leave him, he would kill her and her family.
Nourn told Dr. Friedman:
"`I got pregnant in January [1999]. I wasn't sure if the baby was [Stevens's] or [Barker's] and [Barker] made me get rid of it. He also showed me a gun and said he didn't trust me. He kept saying that if he let me live I'd betray him. Then he wanted me to cut my left pinky off to prove I, wouldn't betray him. When I said I would, he didn't make me do it. I figured it would have been better than his killing me.'"
Nourn graduated from high school in June 1999. In August or September, she moved with Barker to Texas, where he "passed her off as the sister of his ex-girlfriend. Barker was physically abusive. Nourn went to police, claiming she was a runaway, and was placed in a homeless shelter. However, she returned to Barker because she was afraid he would hurt her and her family if she did not. She then found a wedding video and confronted Barker about being married and the father of the baby he had claimed was his godson. When Nourn confronted Barker, he choked her until she almost became unconscious. When Barker began working at a restaurant, he took Nourn to work everyday and had her sit there. If she did not follow his instructions, he beat her. In the summer of 2000, Barker moved his family and Nourn back to San Diego. Nourn began living with his family, but she was not allowed to speak with his wife. Barker's wife was also being abused by him. Nourn told Dr. Friedman: "He'd hit me in front of her, and her in front of me. He was hitting me about three or four times a month." When Nourn learned Barker was having sex with his wife, she became jealous. As Barker was driving Nourn in his car, he fired a shot past her head. Nourn begged for her life and said she loved him and would not question him again. In September 2001, Barker told her he was tired of her contacting her family. He took her to a ravine and said he was going to shoot her. When Nourn begged him not to shoot her, he did not and told her never to contact her family again.
Nourn became friends with two coworkers and confided in them about her abusive relationship with Barker. Nourn told Dr. Friedman: "`They saw the bruises on my leg's from being beaten with an aluminum baseball bat on two occasions. [Barker] also cut me with a knife.'" After her friends urged her to obtain a temporary restraining order against Barker, she did so. However, two days later, Barker broke into her house and told her that if she did not "get rid of the order he would *43 kill her and her brother and sister. Nourn believed Barker was really serious about killing her. She confided in her coworkers about Stevens's killing and then went to police. Nourn told Dr. Friedman that after the preliminary hearing, Barker put a contract out on her family and Marc Carlos (her defense counsel at that time) because he thought she was having an affair with Carlos.
Dr. Friedman's report set forth various conclusions, including:
"Nourn evidences a family background and prior functioning that made her ripe to find herself in an abusive relationship and to exhibit the behavior associated with [BWS]. First, she was only seventeen when she met Barker, and age alone would make her susceptible to influence and control by an older man. As noted, she talks of a longstanding depression and her test results reflect a lack of a sense of identity or meaning to her outlook. To this has been added a sense of helplessness and trepidation to which she is subject given her self-doubts over her ability to cope. Instead, she sees what happens to her as being in the hands of others or fate."
Nourn was "accustomed from her own background to men being dominant and women being subservient. She had witnessed her mother's physical abuse for non-compliance and already had herself been physically mistreated by her mother." "[F]rom the start Barker was controlling, jealous and threatening to her. He kept track of her every move and made her ask his permission to do things away from his personal scrutiny." Dr. Friedman noted: "Even before the murder of David Stevens, Barker was already gradually narrowing Nourn's world and relationships to only himself." When Nourn (falsely) told Barker that Stevens had raped her, "Barker's control and abuse escalated to a new level. He devalued her, hit her, and raped her. He held her responsible and made her feel guilty for what she had done to their relationship. He also threatened to cast her aside, leaving her once again abandoned and on her own. At the same time he offered her a way to purify herself in his eyes. Given her passive, insecure, and dependent adjustment[,] it is thus not surprising that Ms. Nourn went along with Barker's demands and led him to Stevens. While to most adults, it would have seemed that she could have run away or warned Stevens, at only 17 and with little personal strength or judgment, she felt trapped in the situation and forced to do what she needed to do in order to survive." (Italics added.) After the incident, "their relationship settled into an increasingly abusive one. As is quite typical with [BWS,] Barker's threats and physical assaults on her escalated." "Her confession to the police was her means of finally escaping Barker's control and emotional hold, a solution which was akin in other battered women to running off to a shelter, or finally killing their abusive partners." Dr. Friedman's report concluded: "Absent the unfortunate outcome of her becoming a battered woman, she would have never been involved in a murder or any other criminal activity...."
2. Dr. Mechanic. Psychologist Mindy Mechanic's declaration attached a copy of her professional consultation report dated January 11, 2005.[9] In preparing her report, Dr. Mechanic, an expert on intimate *44 partner violence, relied on Dr. Friedman's psychological evaluation report and other documents. Dr. Mechanic's report noted that during the period of August 1998 through December 23,1998:
"Mr. Barker's behavior towards Ms. Nourn was consistent with the behavior of many male batterers described in the clinical and research literatures on male batterers. Ms. Nourn's responses of submission, compliance, appeasement and her deployment of other strategies that function as `survival behavior' are also consistent with those reported in the clinical and research literatures on battering and its effects."
It noted that Barker was possessive and controlling regarding Nourn. Barker "effectively limited Ms. Nourn's interpersonal world to just him, thereby strengthening his hold over her and her dependence on him." Barker also "instilled a climate of fear in their relationship by telling Ms. Nourn stories about his involvement with gangsters and regaling her with stories about prior acts of lethal violence against other women he was involved with." Dr. Mechanic's report concluded:
"In sum, from August 1998 through December 22, 1998, the relationship between Mr. Barker and Ms. Nourn can be characterized as an abusive one. It is notable that no physically violent acts were perpetrated against Ms. Nourn prior to the evening of December 23, 1998, when she disclosed having had a sexual encounter with [Mr.] Stevens. However, Mr. Barker's use of coercive control tactics (including but not limited to inducement of fear and dependency; threats to harm her; surveillance behavior; possessiveness; isolation; secretiveness) in the context of her naivete, young age and considerable needs for attention/affection functioned effectively to dominate and control Ms. Nourn without his having to resort to the use of physically violent tactics. It is worthy of mention that all forms of abusive behavior, while topographically unique, are functionally similar (i.e., the goal is to assert control and domination over another person via actual or threatened harm; instillation of fear; threatened loss of important objects, property, status or relationships; or through acts of shame, humiliation or degradation). Therefore, when non-physically violent acts of abuse successfully achieve their aim of control and domination, then a batterer may not need to perpetrate acts of physical violence unless and until he perceives his control is weakening and/or his partner acts in ways that threaten or undermine his sense of control over her (e.g., she threatens to leave him, challenges his dominion over her or otherwise assert[s] her own view, needs, opinions, or acts with a sense of agency), thus necessitating an escalation of the nature and type of coercive control tactics deployed.
"Finally, due to a variety of personal and developmental history factors, she was at heightened risk of becoming entangled in an abusive relationship. Moreover, given her developmental history, she failed to develop a fully autonomous self; had meager self-esteem that was temporarily buoyed by latching onto a romantic partner upon whom she could depend for affection and attention; and lacked the requisite skills to recognize and appropriately respond to controlling, threatening, menacing and violent acts transacted against her by Mr. Barker." (Italics added.)
Dr. Mechanic's report noted that Barker's "abuse of Ms. Nourn predated their involvement in the acts leading to" Stevens's death. It concluded: "In sum, Ms. Nourn's behavior is consistent with those of other battered women as explicated in *45 the research and clinical literatures on `battering and its effects.' Mr. Barker's abuse of Ms. Nourn undoubtedly contributed to her behavior in the acts leading to the death and cover up of the death of Mr. Stevens." (Italics added.)
3. Dr. Wexler. Psychologist David Wexler's report was based on Dr. Friedman's psychological evaluation report and other documents.[10] Dr. Wexler made the following findings regarding the relationship between Barker and Nourn as it existed prior to Stevens's killing:
"1. Although NOURN was not physically assaulted by BARKER prior to the [murder], she was the victim of a wide range of classic power and control tactics that are characteristic of abusive relationships.
"2. NOURN was physically threatened repeatedly by BARKER, including death threats.
"3. NOURN was led to believe that BARKER had killed others before and that he had Mafia ties.
"4. BARKER engaged in tactics designed to socially isolate and control NOURN, including making her account for her whereabouts, making her ask permission regarding her activities, limiting her friendships, and making decisions about their mutual activities.
"5. BARKER consistently blamed NOURN for hurting him emotionally and preyed on her guilt.
"6. BARKER also engaged in secrecy, deception, and lies about his own life, including denial of his marital status.
"7. BARKER further controlled NOURN by controlling her finances, and she was afraid of his capacity to hurt her father's credit record and to shame her in the process.
"8. NOURN was raped by BARKER just prior to the murder.
"9. When BARKER threatened her with ending the relationship, she agreed to participate in the murder plan to make sure that BARKER did not leave her."
Based on his review of the documents, Dr. Wexler concluded:
"NOURN demonstrated many of the characteristics consistent with individuals affected by `domestic violence and its effects', also known as `battered women's syndrome.' Furthermore, although there is substantial evidence of this pattern in the years subsequent to the murder of David Stevens, there is also clear evidence of this pattern in the months prior to the murder as well. The fact that there was not [a] pattern of direct physical abuse during this period does not discount these conclusions.
"Individuals who experience this pattern of `domestic violence and its effects' often experience a seemingly illogical and irrational restriction of behavioral options that the average person would neither experience nor understand. In this case, it is my opinion that BARKER established a climate in which he had undue influence, intimidation, and control over NOURN." (Italics added.)
4. Dr. Kaser-Boyd. Psychologist Nancy Kaser-Boyd's declaration incorporated a copy of her professional consultation report dated March 20, 2006.[11] In preparing *46 her report, Dr. Kaser-Boyd, an expert on BWS and posttraumatic stress disorder, relied on Dr. Friedman's psychological evaluation report and other documents.[12] Dr. Kaser-Boyd stated: "Ms. Nourn's belief that Mr. Barker would kill her if she didn't follow his directives on the night of Mr. Stevens'[s] murder and immolation [is] evident in her interviews [with police and Dr. Friedman]. The situation she describes, and her spontaneous words in her interviews, indicates it was her perception that there was an imminent threat to her safety if she did not go along with Mr. Barker. Her fear was even greater after Mr. Barker shot Mr. Stevens in the head." (Italics added.) Dr. Kaser-Boyd concluded:
"In my opinion, there is no question that [Barker] was dominant, conniving, threatening, and cruel, with a sociopath's ideas about revenge and compensation. On the other hand, Ms. Nourn was young, naive, needy, and submissive. She seemed infatuated with Mr. Stevens and she had no inherent motive to kill him after a night of pleasant flirtation and lovemaking. Her participation [in the killing and arson] came out of intense fear of imminent death or harm, and her three years' of silence was maintained by a continuation of physical and psychological abuse." (Italics added.)
Furthermore, based on the report of a prosecution investigator, Dr. Kaser-Boyd noted that after the arrests of Barker and Nourn, Barker planned to kidnap Nourn's family members and hold them hostage.[13] Barker would then have someone contact Nourn and inform her that if she did not take full responsibility for Stevens's murder, her family members would be killed. It was after that plan was uncovered that Nourn's then trial counsel Carlos recused himself and Nourn purportedly made certain confidential statements to Cormicle, her new trial counsel, discussed post, that she told Barker to kill Stevens. Dr. Kaser-Boyd concluded those confidential statements, if made, "are not inconsistent with [BWS] and this defense [i.e., BWS defense] should have been explored." She explained:
"There are several possibilities that stem from [BWS]. After Ms. Nourn learned of Mr. Barker's threats to kidnap her family and kill them if she didn't take responsibility for the murder of Mr. Stevens, she changed her original statement and took responsibility, because she knew what he was capable of. On the other hand, it is possible that she took responsibility because she blamed herself for Mr. Stevens'[s] deathbattered women often blame themselves for the bad events in their relationships. Alternatively, she may have said these things to Mr. Barker simply to appease him at those points where she felt terrified that he would kill her. Mr. Cormicle apparently did not consider the possibility that Ms. Nourn's new disclosures to him were out of fear and intimidation, or other effects of battering. He seemingly failed to investigate the nature of the relationship between Mr. Barker and Ms. Nourn, and rendered himself unable to *47 carefully evaluate her disclosure." (Italics added.)
5. Attorney Cormicle. In the November 9, 2005 declaration of Bruce Cormicle, Nourn's defense counsel at trial, he stated: "I made a tactical decision in my representation of Ms. Nourn that I would not call her as a witness in her own defense nor use the [BWS] defense. This is based, in part, on the following: [¶] I began to prepare Ms. Nourn to testify in this case. Also, I considered whether or not an expert would be helpful to present a[BWS] defense. She told me that she lied to her prior defense counsel Marc Carlos, myself, and the police when she said `that she didn't know Barker was going to shoot until he did so.' [¶] Ms. Nourn's statements to mewhich dictated my investigation, preparation, and eventual presentation of the defense used at trialwere that Barker told her: If you love me so much, if I told you to kill him for me, would you do it? I [i.e., Nourn] said, yes, I would. Barker continued. Ok, then you want to shoot him or I shoot him? I told him I don't know how. He said that he would do it himself and that he needed [my] help. I told him that I would not fail him. I told Barker to kill him."
6. Attorney Ulibarri. In the March 22, 2006 declaration of Patricia Ulibarri, the attorney appointed to represent Nourn in her instant amended petition, she (Ulibarri) stated that in her telephone conversation with Cormicle, he told her that he considered a BWS defense and discarded it. After reviewing his trial files, Cormicle sent her a copy of his declaration quoted ante. Ulibarri, together with attorneys Ava Stralla and Greg Kane, met with Cormicle on December 8, 2005, to further discuss his trial tactics. Cormicle told them he became Nourn's retained counsel after Carlos received a death threat from Barker and declared a conflict of interest. Ulibarri noted: "Mr. Cormicle stated that at the time of trial, he believed [Nourn] was an abused woman and knew a[BWS] defense would have been relevant at trial on the issue of [Nourn's] state of mind. Mr. Cormicle could not place [Nourn's confidential] statements [to him] into context other than to say that he believed [Nourn], nor could he answer whether [Nourn's] statements were nonetheless consistent with a BWS defense. Mr. Cormicle also stated that he was aware he did not have to disclose [Nourn's] alleged statements to a potential expert; but that such disclosure would depend on the facts of each case." Ulibarri further noted:
"5. Mr. Cormicle further stated that if [Nourn] had not disclosed her alleged statements to a psychologist or other expert, he believed he would be presenting false evidence to the court if he used an expert. When questioned as to his reasoning, Mr. Cormicle indicated he would need to research the issue further.
"6. Mr. Cormicle stated that he assumed that if he had [Nourn] evaluated she would disclose to a psychologist the statements made to him[.] Mr. Cormicle indicated he would not have retained an expert even if [Nourn's] disclosures were consistent with [BWS] because Mr. Cormicle believed that [Nourn's] disclosure to him if brought out through use of an expert would present only a `harassed' defense. As a result, Mr. Cormicle indicated that he strategically decided that [Nourn's] taped interview with police presented the most sympathetic version of her participation in the events of the homicide to the jury.

"7. Mr. Cormicle recalled presenting the defense of duress during [Nourn's] trial and acknowledged that he knew duress was not a defense to murder. Mr. Cormicle could not recall contacting *48 a psychologist or other expert, but believed he may have called one expert." (Italics added.)
7. Attorney Stralla. In the February 24, 2006 declaration of attorney Ava Stralla, she described the meeting with Cormicle that she attended together with attorneys Ulibarri and Kane. Her declaration described Cormicle's statements during that meeting in a manner consistent with Ulibarri's declaration discussed ante. Stralla stated: "Mr. Cormicle indicated that he had never tried a BWS case, but considered the defense of BWS prior to [Nourn's] trial. He was aware that a jury could consider [Nourn's] actions in relation to BWS under Evidence Code section 1107. However, Mr. Cormicle did not think BWS was appropriate in this case because he was concerned that [Nourn's] confidential disclosure to him was different [from] her confession to police." She further stated: "Mr. Cormicle indicated he understood [Nourn's] relationship with Barker was an abusive one, but did not necessarily think her relationship with Barker was a battered one. Mr. Cormicle believed that BWS was inconsistent with the defense he presented." Cormicle also stated that he believed Nourn's confidential disclosure to him was true and he "had doubts" about her statements to police. Finally, Stralla noted: "Mr. Cormicle stated that he did bring a duress defense and that he knows duress is not a defense to first degree murder. Mr. Cormicle indicated that his strategy was to present the case where there would be the least amount of damage to [Nourn]. Mr. Cormicle wanted the jury to feel sympathetic to [Nourn]."
8. Attorney Kane. In the February 24, 2006 declaration of attorney Greg Kane, he described the meeting with Cormicle that he attended together with attorneys Ulibarri and Stralla. His declaration described Cormicle's statements during that meeting in a manner consistent with Ulibarri's and Stralla's declarations discussed ante. In particular, Kane noted that Cormicle stated: "`Generally, BWS/DV [i.e., domestic violence] is an issue relevant to state of mind.'" Kane's declaration further noted:
"However, Mr. Cormicle did not think BWS was appropriate in this case because [Nourn's] statements to him were different from the statements she made to police, the [former] of which reflected a colder intent which gives rise to the implication [Nourn] knew that the victim was going to be killed. [¶] ... Mr. Cormicle stated that he believed a defense had to be something different than BWS, because he didn't see how BWS facts could be admitted into trial without also bringing in [Nourn's] disclosure.
"... Mr. Cormicle also stated that he would not have hired an expert, even if [Nourn's] statements were consistent with BWS, because he did not think these statements could be downplayed as BWS-caused to the jury, that they `would diminish any defense,' and he tactically did not want to present a `harassed' defense. Rather, Mr. Cormicle's trial strategy was how best to present [Nourn's] side of the case to the jury, and Mr. Cormicle thought the best facts came from [Nourn's] confession to police, which included the threats [Nourn] received from Barker, Barker's stalking of [Nourn], the age disparity, and Barker's use of a pager to track [Nourn's] whereabouts."
Finally, Kane's declaration noted: "When asked if [Nourn's] disclosure implied that she was not a battered woman, Mr. Cormicle stated that he just viewed the statements from the point of view of whether or not he needed an expert. Mr. Cormicle indicated that he knew [Nourn's] mental *49 state was at issue but didn't think an expert would help him understand why [Nourn] went along with what Barker did." (Italics added.)
9. Attorney Brown. In the November 3, 2005 declaration of attorney Douglas Brown, he stated that he represented Nourn on remand after issuance of our opinion in Nourn, supra, D041961. Brown stated that in the past he had represented defendants charged with first degree murder and in each case had hired both a private investigator and a psychologist or psychiatrist to investigate any potential defense. Based on Nourn's description of an abusive relationship with Barker during her tape-recorded interview with police, Brown hired Dr. Friedman to explore issues concerning BWS or any other ancillary mental defense.[14] He stated that Dr. Friedman found Nourn was a victim of BWS. He also hired Dr. Mechanic, who confirmed Dr. Friedman's diagnosis. After Brown disclosed the reports of Drs. Friedman and Mechanic to the prosecution, the prosecution hired its own expert, Dr. Wexler, who confirmed Nourn's diagnosis of BWS.
10. Attorney Shudde. In the March 13, 2006 declaration of attorney Athena Shudde, she stated that she had been primarily a criminal defense trial attorney for 20 years and a criminal appellate attorney for seven years. She was asked by Ulibarri to evaluate Nourn's case regarding the tactics used by Nourn's trial counsel. She conducted an extensive review of documents relating to Nourn's case. Shudde stated:
"Based on my review of these materials, in my opinion, [Nourn's] case called for a comprehensive series of psychological testing of [Nourn] which would have included: (1) a full series of DMS-IV testing; (2) an evaluation by an Asian cultural expert; and (3) an evaluation by a BWS expert. My opinion is based on these factors: (1) the age of [Nourn] and the disparity of age between [Nourn] and ... Barker; (2) the fact that [Nourn] is of Cambodian ancestry suggestive of a cultural pattern of submissiveness to men; (3) the manipulation, stalking, and paging that Barker exerted over [Nourn] suggestive of psychological abuse prior to the homicide of David Stevens; (4) the breaking up of [Nourn's] family unit and [Nourn's] compulsion to stay with Barker after the homicide ostensibly compelled to do so as a result of his credit card fraud and identity theft perpetrated on [Nourn's] father; (5) [Nourn's] lack of criminal history; (6) [Nourn's] association with Robert Bierman as a result of her contacts with him over the internet and then Ron Barker, and her seeming sexual promiscuity suggestive of possibly a history of prior sexual abuse; (7) Barker's criminal history and behavior; and (8) the physical abuse of [Nourn] by Barker after the homicide. It has been my experience that an initial request for ancillary psychological fees for the hiring of experts is routinely done in the San Diego trial courts on an ex parte basis without notice to the prosecution. It has also been my experience that evaluations or other expert materials are not subject to the discovery disclosure statute unless defense counsel intends to use such materials and witness(es) at trial."
Shudde further stated: "Based on my review, it remains my opinion that a psychological defense could not be excluded, nor *50 could defense counsel make an intelligent decision regarding a potential defense until there had been some investigation through use of psychological testing to completely understand why, under these circumstances, a young girl barely 18 years old with no prior criminal history would engage in this type of behavior." (Italics added.) Regarding Nourn's purported confidential statements to Cormicle, Shudde stated: "[R]easonably diligent counsel would not have allowed [Nourn's] statements to be dispositive of a decision to present a psychological defense on her behalf." (Italics added.) In particular, Shudde stated her opinion that reasonably diligent counsel could not "unilaterally determine the truth of [Nourn's] statements" and could not "judge whether [Nourn's] statements were equally consistent with a psychological defense including BWS absent expertise in this area." Regarding Cormicle's trial tactics, Shudde concluded:
"6. I am aware that trial counsel's tactical reasoning consisted of a decision not to run the risk of [Nourn's] confidential disclosure being presented to the jury; opting instead to present [Nourn's] version to police as being a more sympathetic version to the jury. I am also aware that trial counsel presented the defense of duress at [Nourn's] trial having read the opening and closing statements. In my opinion, counsel's tactical conclusion amounted to a destruction of his case without an intelligent understanding of available avenues of defensenotwithstanding [Nourn's] alleged disclosure in this case.

"7. By presenting a defense of duress at trial, it remains my opinion that defense counsel left no avenue by which a jury could understand [Nourn's] behavior prior to and antecedent to the homicide. In essence, defense counsel engaged in a high-risk `crap-shoot' that the jury would understand [Nourn's] actions without presenting any substantial evidence that could lead a jury to this conclusion and thus, to a reasonable doubt as to her specific mental state." (Italics added.)
11. Attorney Brauer. In the March 6, 2006 declaration of attorney Inge Brauer, she stated that her practice had been almost exclusively criminal defense work since 1983. She was asked by Ulibarri to evaluate Nourn's case regarding the tactics used by Nourn's trial counsel. She conducted an extensive review of documents relating to Nourn's case. Brauer stated: "Based on my review of these materials, in my opinion, [Nourn's] case called for the psychological testing of [Nourn] by an Asian cultural expert and an expert in BWS, with amplification placed on BWS." Regarding Nourn's trial counsel's explanation of his trial tactics, Brauer stated:
"[The] decision [not to present a BWS expert at trial] simply doesn't make any tactical sense. In my opinion, experienced counsel simply does not believe everything a client tells them. Moreover, defense counsel is not in a position to make a unilateral judgment of his or her client's credibility. Even if [Nourn's] disclosure were true, this would have only affected trial counsel's ability to put [Nourn] on the stand. This would not have prevented an expert from testifying on [Nourn's] behalf. [¶] ... [¶] ... In my opinion, counsel literally had nothing to [lose] by obtaining the services of psychological experts. Even if the reports proved unfavorable to the defense, counsel simply could have discarded their use at trial without the necessity of discovery to the prosecution." (Italics added.)
Brauer further stated: "While [Cormicle] may have reasonably believed that [Nourn's] confession to police presented the jury with a more sympathetic version *51 of her side of the case, [Cormicle] left the jury literally no defense to `hang its hat on' in [Nourn's] favor." (Italics added.) Brauer stated: "In my opinion, with a BWS defense, the jury would have understood [Nourn's] conduct prior to and after the homicide. Without such a defense, the jury had no choice but to convict [Nourn]." (Italics added.) Finally, Brauer concluded: "[I]t remains my overall opinion that [Cormicle] engaged in inadequate investigation by failing to engage an expert to perform psychological testing of [Nourn] which would have been relevant to [Nourn's] state of mind despite [her] disclosure. As such, counsel deprived himself of making any type of informed tactical decision on whether or not a viable defense was available to [Nourn] during her trial." (Italics added.)
12. The People's Return. In opposing Nourn's instant amended petition, the People did not attach to their return or otherwise submit any declarations or other documents (e.g., declarations of BWS experts or criminal defense attorneys).

B
Based on our review of the record in this case, including the declarations of BWS and criminal defense experts, and applicable law, we conclude the performance of Nourn's trial counsel was below an objective standard of reasonableness under prevailing professional norms. (Strickland v. Washington, supra, 466 U.S. at pp. 687, 691-692, 104 S.Ct. 2052; People v. Ledesma, supra, 43 Cal.3d at pp. 216-217, 233 Cal.Rptr. 404, 729 P.2d 839.) Nourn's counsel did not conduct an adequate investigation based on the information he possessed, which, had it been performed, may have produced evidence regarding Nourn's state of mind and duress at the time of the incident and at the time she made confidential statements to her counsel. (Strickland v. Washington, supra, at pp. 690-691, 104 S.Ct. 2052.) Had Nourn's counsel conducted an adequate investigation and received that evidence, he would have had an informed basis on which to make a tactical decision to not present that evidence at trial in the circumstances of this case. (Ibid.)
Nourn's trial counsel Cormicle assumed her confidential statements to him were truthful. In his declaration, he stated that "Nourn's [confidential] statements to me ... dictated my investigation, preparation, and eventual presentation of the defense used at trial...." (Italics added.) In Stralla's declaration, she states that during her meeting with Cormicle he told her he believed Nourn's confidential statements to him were true and he "had doubts" about her statements to police. However, Cormicle was aware that, before Nourn made those statements to him, she knew of Barker's threats that if she did not accept full responsibility for the crimes, he would have her family killed. Furthermore, Cormicle was aware that Nourn's prior counsel (i.e., Carlos) had recused himself after learning of Barker's plan to have him (Carlos) killed.[15] Cormicle also believed that Nourn was abused by Barker.[16]
In Shudde's declaration, she stated her opinion that reasonably diligent counsel could not "unilaterally determine the truth of [Nourn's] statements." (Italics added.) Similarly, in Brauer's declaration, she stated: *52 "In my opinion, experienced counsel simply does not believe everything a client tells them. Moreover, defense counsel is not in a position to make a unilateral judgment of his or her client's credibility." The case of People v. Corona (1978) 80 Cal.App.3d 684, 145 Cal.Rptr. 894, cited by Nourn, is analogous. In Corona, the court concluded defense counsel was ineffective by not investigating the defendant's mental condition before deciding not to seek a competency hearing and not presenting a mental condition defense. (Id. at pp. 715-716, 145 Cal.Rptr. 894.) The court criticized defense counsel's decision not to have the defendant plead not guilty by reason of insanity based solely on his conversations with the defendant and his own judgment and without the assistance of an expert. (Id. at p. 715, 145 Cal.Rptr. 894.) Corona noted that defense counsel "acted as the sole determiner of Corona's mental state without the advice and help of experts." (Ibid.) Finally, we note the American Bar Association's rules of professional conduct for criminal defense counsel state: "The duty to investigate exists regardless of the accused's admissions or statements to the lawyer of facts constituting guilt...." (1 ABA Stds. for Crim. Justice (2d ed.1980), std. 4-4.1, p. 4.53.) We are persuaded that Nourn's trial counsel, with the knowledge discussed ante and in the circumstances of this case, would not, under prevailing professional norms, have necessarily assumed Nourn's confidential statements (which were inconsistent with her prior statements to police and to her prior counsel) were true. By allowing Nourn's confidential statements to him to "[dictate his] investigation, preparation, and eventual presentation of the defense used at trial," Nourn's trial counsel did not comply with prevailing professional norms. (Strickland v. Washington, supra, 466 U.S. at pp. 687, 691-692, 104 S.Ct. 2052; People v. Ledesma, supra, 43 Cal.3d at pp. 216-217, 233 Cal.Rptr. 404, 729 P.2d 839.)
Nourn's trial counsel, under prevailing professional norms, had no reason not to have Nourn psychologically evaluated for possible BWS, state of mind, duress, or other defenses. First, evaluations by BWS or other psychological experts (had Nourn disclosed the same confidential statements to those experts) may have revealed that Nourn's confidential statements were not, in fact, true. Second, even if Nourn's statements were believed to be true based on psychological evaluations, the evaluations could have concluded that Nourn's confidential statements were not inconsistent with BWS and did not preclude a possible BWS, state of mind, duress or other defense. Dr. Kaser-Boyd's declaration provides support for both conclusions. Dr. Kaser-Boyd concluded Nourn's confidential statements, if made, "are not inconsistent with [BWS] and this defense [i.e., BWS defense] should have been explored." She explained:
"There are several possibilities that stem from [BWS]. After Ms. Nourn learned of Mr. Barker's threats to kidnap her family and kill them if she didn't take responsibility for the murder of Mr. Stevens, she changed her original statement and took responsibility, because she knew what he was capable of. On the other hand, it is possible that she took responsibility because she blamed herself for Mr. Stevens'[s] deathbattered women often blame themselves for the bad events in their relationships. Alternatively, she may have said these things to Mr. Barker simply to appease him at those points where she felt terrified that he would kill her. Mr. Cormicle apparently did not consider the possibility that Ms. Nourn's new disclosures to him were out of fear and intimidation, or other effects of battering. He seemingly *53 failed to investigate the nature of the relationship between Mr. Barker and Ms. Nourn, and rendered himself unable to carefully evaluate her disclosure."
Had psychological evaluations been conducted and Nourn made the same confidential statements during those evaluations, those statements, whether true or not, may not have precluded a possible BWS, state of mind, duress, or other defense. Although trial counsel explained in his declaration that he made a tactical decision not to investigate and present a BWS defense based, in part, on Nourn's confidential statements, absent an adequate and reasonable investigation, no tactical decision could be made in the circumstances of this case without psychological evaluations of Nourn to potentially support BWS, mental state, duress, or other defenses. "[Strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." (Strickland v. Washington, supra, 466 U.S. at pp. 690-691, 104 S.Ct. 2052.) Nourn's trial counsel had the duty to investigate carefully all defenses of fact and of law that may have been available to her. (In re Williams, supra, 1 Cal.3d at p. 175, 81 Cal.Rptr. 784, 460 P.2d 984.) "[T]o render reasonably competent assistance, an attorney bears certain basic responsibilities, including the investigation of available defenses and, in an appropriate case, the obtaining of a psychiatric examination. [Citation.]" (People v. Frierson, supra, 25 Cal.3d at pp. 160-161, 158 Cal.Rptr. 281, 599 P.2d 587, italics added.) "In assessing the reasonableness of an attorney's investigation, ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." (Wiggins v. Smith (2003) 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471.) In the circumstances of this case, Nourn's counsel had evidence regarding Barker's abuse of Nourn and Barker's recent threats against her family that would have led an attorney, under prevailing professional norms, to investigate further by retaining one or more experts to conduct psychological evaluation(s) of Nourn regarding possible BWS, mental state, duress, and other defenses. (Ibid.)
According to the declarations of Shudde and Brauer submitted by Nourn, in the circumstances of this case those experienced criminal defense attorneys would have investigated further by obtaining psychological evaluations of Nourn regarding BWS and potential defenses. The People have not submitted any contrary declarations of criminal defense attorneys. The decision of Nourn's counsel not to obtain those evaluations constituted an unreasonable limitation of investigation that fell below objective standards of prevailing professional norms and precluded him from making a knowledgeable tactical decision regarding those possible defenses.[17] (Wiggins v. Smith, supra, 539 U.S. at pp. 533-534, 123 S.Ct. 2527; Strickland v. Washington, supra, 466 U.S. at pp. 690-692, 104 S.Ct. 2052; In re Saunders (1970) 2 Cal.3d 1033, 1048-1049, 88 Cal.Rptr. 633, 472 P.2d 921.)
*54 Furthermore, Nourn's trial counsel should not have presumed Nourn would have made the same confidential statements to experts that she purportedly made to him. The record does not show Nourn would have made the same statements to a psychological expert.[18] Nourn's trial counsel admitted to Ulibarri that he was aware he did not have to disclose Nourn's confidential statements to a potential expert. Absent the disclosure of Nourn's confidential statements to a BWS or other psychological expert, counsel would have had no reason not to investigate and present at trial a potentially meritorious BWS, mental state, or duress defense.[19] In any event, even had Nourn made those confidential statements to an expert, Nourn's counsel was not required to disclose those statements or other portions of a psychological evaluation unless that expert testified at trial, as noted in the declarations of Shudde and Brauer. (See, e.g., Torres v. Municipal Court (1975) 50 Cal.App.3d 778, 784, 123 Cal. Rptr. 553.) Finally, even had those statements been made to an expert who testified at trial, the admission of those statements at trial would not have precluded a potential BWS, mental state, or duress defense, as shown by the declaration of Dr. Kaser-Boyd. Dr. Kaser-Boyd concluded Nourn's confidential statements, assuming they were made, "are not inconsistent with [BWS] and this defense [i.e., BWS defense] should have been explored." Even had Nourn's confidential statements been disclosed at trial, under prevailing professional norms, counsel would have investigated and presented a BWS, mental state, and/or duress defense at trial. Shudde declared:
"I am aware that [Cormicle's] tactical reasoning consisted of a decision not to run the risk of [Nourn's] confidential disclosure being presented to the jury; opting instead to present [Nourn's] version to police as being a more sympathetic version to the jury. I am also aware that [Cormicle] presented the defense of duress at [Nourn's] trial having read the opening and closing statements. In my opinion, counsel's tactical conclusion amounted to a destruction of his case without an intelligent understanding of available avenues of defense notwithstanding [Nourn's] alleged disclosure in this case."
Brauer includes a similar conclusion in her declaration.[20] The People do not submit *55 any declarations to the contrary. Although Cormicle attempted to present a duress defense at trial, he, like defense counsel in People v. Frierson, supra, 25 Cal.3d 142, 158 Cal.Rptr. 281, 599 P.2d 587, presented an undeveloped defense theory and offered no expert testimony and insufficient or no other evidence to support that theory. (Id. at pp. 159, 163, 158 Cal.Rptr. 281, 599 P.2d 587.) In this case, because Nourn's counsel did not present substantial evidence to support a duress defense and yet attempted to essentially argue that theory in closing, the trial court granted the prosecutor's request for an admonition to the jury that duress was not a defense to the charges in this case. As the court in Frierson concluded, the defense theory of Nourn's counsel "was doomed to failure in the absence of any competent evidence supporting it." (Id. at p. 163, 158 Cal.Rptr. 281, 599 P.2d 587.)
In Nourn, supra, D041961, we concluded the trial court properly denied the request of Nourn's counsel for an instruction on the defense of duress because there was no substantial evidence to support that instruction. (Nourn, supra, at pp. 18-19.) Although Cormicle told Ulibarri, Stralla, and Kane that he tactically chose not to present a "half-assed" defense of BWS, Cormicle's tactical decision to present no defense evidence and argue duress based solely on Nourn's statements to police resulted, in effect, in no defense being presented on her behalf. He apparently relied on the presumed sympathy for her that would flow from her statements to police and possibly result in a second degree murder conviction. The tactical decision by Nourn's counsel not to investigate the possible defenses available based on BWS expert testimony and therefore not present any defense evidence on state or mind or duress fell below an objective standard of reasonableness under prevailing professional norms. (Strickland v. Washington, supra, 466 U.S. at pp. 687, 691-692, 104 S.Ct. 2052; People v. Ledesma, supra, 43 Cal.3d at pp. 216-217, 233 Cal.Rptr. 404, 729 P.2d 839; People v. Pope, supra, 23 Cal.3d at p. 425, 152 Cal. Rptr. 732, 590 P.2d 859.) The People do not show otherwise.[21]

C
Because we conclude the performance of Nourn's counsel in this difficult case was below an objective standard of reasonableness under prevailing professional norms, we address the second prong of a claim of ineffective assistance of counselwhether Nourn was prejudiced by her counsel's performance. To show prejudice, *56 Nourn must show there is a reasonable probability that she would have received a more favorable result had her counsel's performance not been below the prevailing professional norms. (Strickland v. Washington, supra, 466 U.S. at pp. 693-694, 104 S.Ct. 2052; People v. Ledesma, supra, 43 Cal.3d at pp. 217-218, 233 Cal.Rptr. 404, 729 P.2d 839.) "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the [trial counsel's] errors, the factfinder would have had a reasonable doubt respecting guilt." (Strickland, at p. 695, 104 S.Ct. 2052.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome. [Citation.]" (People v. Williams, supra, 16 Cal.4th at p. 215, 66 Cal.Rptr.2d 123, 940 P.2d 710.) Prejudice may be shown "even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." (Strickland, at p. 694, 104 S.Ct. 2052; see also Hoffman v. Arave (9th Cir.2001) 236 F.3d 523.) "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (Strickland, at p. 686, 104 S.Ct. 2052; see also In re Visciotti (1996) 14 Cal.4th 325, 352, 58 Cal.Rptr.2d 801, 926 P.2d 987.)
Expert testimony on BWS is admissible if relevant to prove or disprove a disputed issue. (§§ 210, 351, 801, 1107; People v. Gadlin, supra, 78 Cal.App.4th at p. 592, 92 Cal.Rptr.2d 890; People v. Brown, supra, 33 Cal.4th at pp. 895-896, 905-907, 16 Cal.Rptr.3d 447, 94 P.3d 574; People v. Humphrey, supra, 13 Cal.4th at p. 1088, 56 Cal.Rptr.2d 142, 921 P.2d 1.) In the circumstances of this case, there are a number of disputed issues on which BWS evidence was relevant and therefore admissible. First, BWS evidence would have been relevant to and therefore admissible on the defense of duress. Contrary to the trial court's and the People's apparent belief, duress can be a defense to a charge of murder if the prosecution's theory is that the defendant aided and abetted the commission of a predicate or "target" offense and that a confederate's murder of the victim was a natural and probable consequence of that predicate or target offense. In the context of a felony murder, the Supreme Court noted in People v. Anderson (2002) 28 Cal.4th 767, at page 784, 122 Cal.Rptr.2d 587, 50 P.3d 368: "[D]uress can, in effect, provide a defense to murder on a felony-murder theory by negating the underlying felony. [Citations.]" Anderson explained:
"If one is not guilty of the underlying felony due to duress, one cannot be guilty of felony murder based on that felony. Here, for example, the court instructed the jury that duress could be a defense to the kidnapping charge. It also instructed on felony murder with kidnapping as the underlying felony. If the jury had found defendant not guilty of kidnapping due to duress (it did not), it could not have found that he killed during the commission of that kidnapping. Defendant could not have killed during the perpetration of a crime of which he was innocent." (Ibid.)
People v. Callahan (2004) 124 Cal.App.4th 198, 21 Cal.Rptr.3d 226 cited Anderson in stating: "[D]uress is a viable defense to the underlying felony of a felony murder. [Citation.]" (Callahan, at p. 207, fn. 3, 21 Cal.Rptr.3d 226.) We believe the reasoning in Anderson necessarily applies in a like manner to the "natural and probable consequences" theory of accomplice liability. If a defendant is not guilty of aiding and abetting the commission of a predicate or target offense because of duress, he or she cannot be guilty of murder committed by a *57 confederate on a theory that the murder was a natural and probable consequence of that predicate or target offense. (Anderson, at p. 784, 122 Cal.Rptr.2d 587, 50 P.3d 368; People v. Prettyman (1996) 14 Cal.4th 248, 267-268, 58 Cal.Rptr.2d 827, 926 P.2d 1013 [for "natural and probable consequences" accomplice liability to apply, jury must be convinced, beyond a reasonable doubt, that defendant aided and abetted the commission of the predicate or target offense]; cf. People v. Mendoza (1998) 18 Cal.4th 1114, 1118, 1133, 77 Cal.Rptr.2d 428, 959 P.2d 735 [evidence of defendant's voluntary intoxication is admissible on defense to aiding and abetting predicate or target offense in "natural and probable consequences" case, which defense could preclude defendant's accomplice liability for confederate's murder of victim].) Accordingly, we conclude "duress can, in effect, provide a defense to murder" based on a "natural and probable consequences" theory of accomplice liability "by negating the underlying [predicate or target offense]." (Anderson, at p. 784, 122 Cal.Rptr.2d 587, 50 P.3d 368.) In this case, the prosecutor argued Nourn was guilty of first degree murder solely on the "natural and probable consequences" theory of accomplice liability. The prosecutor argued that because Nourn aided and abetted Barker's assault on Stevens, Nourn was guilty of Stevens's murder, a natural and probable consequence of that assault. Therefore, the defense of duress would have been a valid defense theory had Nourn's counsel presented sufficient evidence of duress at trial. (Ibid.; Callahan, at p. 207, fn. 3, 21 Cal.Rptr.3d 226; cf. Mendoza, at pp. 1118, 1133, 77 Cal. Rptr.2d 428, 959 P.2d 735.) In the circumstances of this case, we conclude counsel could have presented sufficient evidence on duress as a defense to assault (i.e., the predicate or target offense of the prosecutor's "natural and probable consequences" theory of accomplice liability). Without elaborating on the elements of a duress defense, we note that counsel could have presented BWS or other psychological evidence showing Nourn aided and abetted Barker's assault because she was actually and reasonably in imminent fear for her life. (Pen.Code, § 26(6); People v. Petznick (2003) 114 Cal.App.4th 663, 676, 7 Cal.Rptr.3d 726.) Nourn needed "to raise only a reasonable doubt that [she] acted in the exercise of [her] free will. [Citation.]" (Petznick, supra, at p. 676, 7 Cal.Rptr.3d 726.)
In this case, had Nourn's counsel conducted an adequate investigation, including psychological evaluations of Nourn by BWS or other psychological experts, he would have obtained strong evidence that Nourn suffered from BWS at the time of the incident and that Barker's threats caused her to be in imminent fear for her life if she did not aid his planned assault on Stevens. Nourn's counsel would have obtained an expert opinion from a BWS expert, like Dr. Kaser-Boyd's opinion, that Nourn's "participation [in the killing of Stevens] came out of intense fear of imminent death or harm" because of Barker's threats or menace. In her declaration, Dr. Kaser-Boyd further concluded: "Ms. Nourn's belief that Mr. Barker would kill her if she didn't follow his directives on the night of Mr. Stevens'[s] murder and immolation [is] evident...." Had Nourn's counsel presented that BWS evidence, substantial evidence of duress could have been obtained and presented at trial, which would have been sufficient to support a jury instruction on the defense of duress. Instructed and presented with strong BWS evidence, including evidence of Barker's virtually maniacal control over and threats against Nourn, it could be found that Nourn aided and abetted Barker's assault on Stevens not of her own free will, *58 but rather because of duress. (Cf. Wiggins v. Smith, supra, 539 U.S. at p. 537, 123 S.Ct. 2527 ["Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."].) Accordingly, absent a finding that Nourn, of her own free will, aided and abetted Barker's assault, she could not be guilty of assault and therefore she could not be found guilty of first degree murder on the prosecutor's "natural and probable consequences" theory of accomplice liability.
Similarly, we also conclude counsel could have obtained and presented at trial strong evidence that Nourn aided and abetted Barker's arson because she was actually and reasonably in imminent fear for her life. (Pen.Code, § 26(6); People v. Petznick, supra, 114 Cal.App.4th at p. 676, 7 Cal.Rptr.3d 726.) Had an investigation been conducted, it is likely expert opinions, like that of Dr. Kaser-Boyd, would have been obtained. Dr. Kaser-Boyd concluded that Nourn's participation in the arson "came out of intense fear of imminent death or harm." The evidence shows Nourn had just watched Barker kill Stevens by shooting him in the head. Dr. Kaser-Boyd further concluded that Nourn's "fear was even greater after Mr. Barker shot Mr. Stevens in the head." Also, had Nourn testified at trial, she presumably would have testified consistently with her statement to Dr. Friedman that after Barker shot Stevens, Barker told her "he'd kill me if I didn't help him burn the body." Therefore, properly instructed and presented with strong evidence on BWS and Barker's immediate threat to kill Nourn if she did not aid him in the arson, the jury could have found it was not proven beyond a reasonable doubt that Nourn aided and abetted Barker's arson of her own free will, but rather because of duress.
Second, and possibly more importantly, BWS evidence would have been relevant to and therefore admissible on a state of mind, or mental state, defense. Unlike the defense of duress, a state of mind defense requires only evidence that would preclude a finding beyond a reasonable doubt that the defendant had the requisite intent (or other mental state) for the charged crime. The prosecutor argued Nourn was guilty of first degree murder solely on a "natural and probable consequences" theory of accomplice liability, for which the predicate or target offense was her aiding and abetting Barker's assault on Stevens. In the circumstances of this case, we conclude counsel could have presented sufficient evidence to refute the prosecutor's argument that she had the requisite intent to aid and abet Barker's assault. "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen.Code, § 240.) For liability as an aider and abettor of a perpetrator's assault or other criminal act, a person must have "knowledge that the perpetrator intends to commit [an assault or other] criminal act together with the intent to encourage or facilitate such act...." (People v. Coffman and Marlow (2004) 34 Cal.4th 1, 108, 17 Cal.Rptr.3d 710, 96 P.3d 30, italics added.)[22]
"[T]he mental state for aider and abettor liability, which has intent and knowledge components, is a `required specific *59 intent' for purposes of [Penal Code] section 22, subdivision (b). [Citation.] An aider and abettor must `"act with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense."' [Citation.]" (People v. Atkins (2001) 25 Cal.4th 76, 92, 104 Cal.Rptr.2d 738, 18 P.3d 660.) The intent requirement for aiding and abetting liability is specific intent. (People v. Mendoza (1998) 18 Cal.4th 1114, 1131, 77 Cal.Rptr.2d 428, 959 P.2d 735; People v. Son (2000) 79 Cal. App.4th 224, 239, 93 Cal.Rptr.2d 871.) Therefore, in this case for Nourn to have been found guilty of aiding and abetting Barker's assault on Stevens, the jury must have found beyond a reasonable doubt that Nourn not only had knowledge of Barker's plan to assault Stevens, but also had the specific intent to commit, or encourage or facilitate Barker's commission of, the assault on Stevens. (Son, at p. 239, 93 Cal.Rptr.2d 871; see also People v. Reyes (1997) 52 Cal.App.4th 975, 985, 61 Cal.Rptr.2d 39 ["classification of [a] crime as one of general intent has nothing to do with the required element of knowledge, a specific mental state"]; People v. Bobo (1990) 229 Cal.App.3d 1417, 1442, 3 Cal. Rptr.2d 747["[I]f a crime requires a particular mental state, the Legislature cannot deny a defendant the opportunity to prove he [or she] did not entertain that state."].)
In this case, had Nourn's counsel conducted an adequate investigation, including psychological evaluations of Nourn by BWS or other psychological experts, her counsel might have obtained strong evidence that Nourn suffered from BWS at the time of the incident. Furthermore, BWS or other psychological experts could have testified regarding the effects of BWS on the beliefs, perceptions, or behavior of Nourn, as a BWS victim. (§ 1107, subd. (a).) Although those experts presumably could not testify on the ultimate issue of whether Nourn, in fact, possessed the requisite knowledge and specific intent for aiding and abetting Barker's assault on Stevens, they could have testified generally on BWS and its effects and, given appropriate hypotheticals, could have aided the jury in understanding Nourn's mental processes as a BWS victim. (§§ 801, 1107, subd. (a).) People v. Erickson (1997) 57 Cal.App.4th 1391, 67 Cal.Rptr.2d 740 does. not preclude, but rather supports, the admission of expert testimony on BWS and its effects.[23]
"An expert's opinion about a defendant's mental state does not violate [Penal Code section 29] as long as the expert does not express an opinion on the ultimate issue that defendant did or did not have a mental state required for a charged offense. [Citations.]"[24] (People v. Aris, supra, 215 *60 Cal.App.3d at p. 1198, 264 Cal.Rptr. 167.) Arts concluded the expert's "proposed testimony that defendant was a battered woman and how being a battered woman affected defendant's perceptions and conduct stops short of the ultimate issue of what defendant's perception actually was and, therefore, does not violate [Penal Code] section 29." (Aris, at p. 1198, 264 Cal.Rptr. 167, fn. omitted.). Without repeating the extensive opinions set forth in the declarations of the BWS and psychological experts quoted ante (i.e., Drs. Friedman, Mechanic, Wexler, and Kaser-Boyd), we conclude the record contains substantial evidence that, if obtained and presented at trial, would support a finding that it was not proven beyond a reasonable doubt Nourn had the requisite specific intent to commit, or encourage or facilitate Barker's commission of, the assault on Stevens. (Cf. Wiggins v. Smith, supra, 539 U.S. at p. 537, 123 S.Ct. 2527 ["Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."].) Accordingly, absent a finding Nourn had the requisite specific intent for aiding and abetting the assault on Stevens, she could not be guilty of assault and therefore she could not be found guilty of first degree murder on the prosecutor's "natural and probable consequences" theory of accomplice liability.[25]
Similarly, we also conclude counsel might have obtained and presented at trial strong evidence that Nourn lacked the requisite specific intent to commit, or encourage or facilitate Barker's commission of, the arson. We conclude the record contains substantial evidence that, if obtained and presented at trial by counsel, would support a finding it was not proven beyond a reasonable doubt that Nourn had the requisite specific intent to commit, or encourage or facilitate Barker's commission of, the arson. (Cf. Wiggins v. Smith, supra, 539 U.S. at p. 537, 123 S.Ct. 2527.)
Finally, BWS evidence would have been relevant to and therefore admissible on Nourn's credibility had she (on advice of counsel or otherwise) testified at trial and, apparently, even if she had not testified at trial. (People v. Brown, supra, 33 Cal.4th at pp. 895-896, 908, 16 Cal.Rptr.3d 447, 94 P.3d 574; People v. Day (1992) 2 Cal. App.4th 405, 415-416, 420, 2 Cal.Rptr.2d 916, disapproved on another ground in People v. Humphrey, supra, 13 Cal.4th at p. 1086, 56 Cal.Rptr.2d 142, 921 P.2d 1.) Day stated:
"We conclude the failure to present BWS evidence was prejudicial: the evidence was not only relevant, but critical in permitting the jury to evaluate appellant's testimony free of the misperceptions regarding battered women. Appellant's testimony provided the only eyewitness account. The prosecution's case rested on circumstantial evidence and exploitation of myths about battered women. The prosecutor repeatedly relied on misconceptions about battered women in urging the jury to reject appellant's claim of self-defense. Because [defense] counsel was unaware of the BWS he was unable effectively to counter the prosecutor's contention that appellant's conduct was inconsistent with *61 self-defense. Rather, he himself perpetuated several erroneous notions about battered women. Had the evidence of the BWS been introduced, he effectively could have countered the battered woman myths on which the prosecutor built his case. [Citation.] [¶] BWS evidence would have bolstered appellant's credibility and lent credence to her self-defense claim." (People v. Day, supra, 2 Cal.App.4th at pp. 419-20, 2 Cal. Rptr.2d 916.)
Brown appears to support the position that BWS evidence is admissible as relevant to the credibility of statements made by the defendant to police. Brown concluded BWS evidence was admissible under section 801 "because it would assist the trier of fact in evaluating the credibility of the victim's trial testimony and earlier statements to the police, by providing relevant information about the tendency of victims of domestic violence later to recant or minimize their description of that violence. [Citation.]" People v. Brown, supra, 33 Cal.4th at pp. 895-896, 16 Cal. Rptr.3d 447, 94 P.3d 574 (italics added.) Therefore, another ground for admission of BWS evidence in this case would have been to bolster Nourn's credibility regarding her trial testimony and prior statements to police. BWS evidence, if presented at trial, could have assisted the jury in understanding why Nourn made some of those statements and explained her behavior during and after the incident, including her confidential statements made to her trial counsel.
We conclude the performance of Nourn's trial counsel was prejudicial to Nourn. At trial, Nourn's trial counsel apparently had the primary "defense" of trying to have Nourn appear "sympathetic" to the jury based on the videotaped and transcribed statements she made to police. However, mere sympathy is not a defense to either first degree murder or arson. Nourn's trial counsel also argued in closing that Nourn did not know, in advance, that Barker intended to kill Stevens. However, because the prosecutor's sole theory of liability was the "natural and probable consequences" theory of accomplice liability, Nourn's lack of such advance knowledge was irrelevant to the legal issues facing the jury. That argument did not disprove the elements of the underlying felony of aiding and abetting Barker's assault on Stevens. Therefore, as the criminal defense experts concluded, Nourn effectively had "no defense" to the charges against her because there was no evidence on possible BWS, state of mind, duress, and/or other defenses. In contrast, those possible defenses could have been investigated and evidence might have been obtained. Had counsel presented BWS or other psychological evidence at trial, it is reasonably probable that Nourn would have received a more favorable result.[26] (Strickland v. Washington, supra, 466 U.S. at pp. 693-694, 104 S.Ct. 2052; People v. Ledesma, supra, 43 Cal.3d at pp. 217-218, 233 Cal. Rptr. 404, 729 P.2d 839.) Alternatively stated, the absence of an adequate investigation, and the results of that investigation, in this case undermines our confidence in the outcome of her trial. (People v. Williams, supra, 16 Cal.4th at p. 215, 66 Cal.Rptr.2d 123, 940 P.2d 710.) The absence of this information "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (Strickland, supra, at p. 686, 104 S.Ct. 2052; see also In re Visciotti, supra, 14 Cal.4th at p. 352, 58 Cal.Rptr.2d 801, 926 P.2d 987.)

*62 DISPOSITION
The judgment is vacated, and the matter is remanded to the Superior Court of San Diego County to conduct further proceedings.
BENKE, Acting P.J., dissenting.
In the early morning hours of December 23, 1998, the victim in this case, David Stevens, dated Ny Nourn and engaged in sex with her. Immediately after her date with Stevens, Nourn was confronted by Ron Barker, a jealous and possessive man she had known and dated for four months. Nourn lied, telling Barker that Stevens had just raped her. Together the two of them returned to Stevens's apartment. Nourn went to the door and lured Stevens out to help her on the pretext that her car was stalled. Stevens agreed to drive Nourn back to her car. The two drove for approximately 12 miles and stopped. Barker, who was following them in his own car, pretended to be Nourn's brother. He got into the back seat of Stevens's car and shot him execution style twice in the head. On a city street Nourn and Barker set Stevens's car on fire with his body inside. Nourn later told Barker she made up the story that Stevens raped her.
The majority finds Nourn's retained trial counsel was ineffective because he deprived her of the defense of duress. The hurdle the majority faces is explaining how a duress defense can be presented on a charge of murder. Penal Code section 26 and well-settled case law hold duress is not available to a defendant facing murder charges. (People v. Anderson (2002) 28 Cal.4th 767, 767, 784, 122 Cal.Rptr.2d 587, 50 P.3d 368.) My colleagues deal with this problem by first concluding the prosecution's sole theory of the case was the reasonable and probable outcome doctrine of aiding and abetting. Under this doctrine the perpetrator of an offense is responsible for all criminal acts committed, while the aider and abettor is responsible only for those crimes reasonably foreseeable when their "target crime" is committed. (People v. Woods (1992) 8 Cal.App.4th 1570, 1587, 11 Cal.Rptr.2d 231.) The majority concludes that an aider and abettor may show he or she committed the target crime under duress. My colleagues create this theory by borrowing, and applying to aiding and abetting, a concept applicable to felony murder, namely, that in felony murder cases duress is a defense to the underlying felony, and thus, to the murder. The majority describes the target crime here as an assault against Stevens and' further concludes that Nourn assisted in committing the assault because she was acting under duress. The duress, they assert, sprang from abusive treatment by Barker, Nourn's cohort in Stevens's murder. The majority therefore concludes that defense counsel was ineffective because he failed to more fully investigate or offer the battered woman syndrome as a defense theory.
There are a number of problems with the majority opinion. Chief among them is that whatever may be said of the majority analysis, my colleagues have created a body of law that did not exist at the time of Nourn's trial. Defense counsel cannot be held ineffective for failing to utilize a defense that was not in existence when he prepared for trial. (Lockhart v. Fretwell (1993) 506 U.S. 364, 113 S.Ct. 838, 122 L.Ed.2d 180; People v. Green (1980) 27 Cal.3d 1, 45, 164 Cal.Rptr. 1, 609 P.2d 468; People v. Russell (1980) 101 Cal.App.3d 665, 668, 161 Cal.Rptr. 735.) Certainly, no defense counsel should be held incompetent for not being prescient enough in 2003 to predict this court would for the first time in 2006 apply a newly minted theory of duress relative to felony murder to the law of aiding and abetting, and do so by expanding the battered woman syndrome *63 far beyond any recognized application of that doctrine.
To more fully appreciate the problems created by my colleagues it is necessary to unwind the analysis and examine its parts.

The Majority's Premise
As a starting point, I would observe the premise of the majority opinion, that the sole theory of the prosecution's case was aiding and abetting an assault, is incomplete. The jury was expressly instructed there were only two theories of criminal liability presented to them, premeditated first degree murder and lying in wait. While the prosecution's argument is not as clear as it might be, as I interpret the argument the first degree premeditated murder theory was argued in the alternative as directly aiding and abetting in a murder and aiding and abetting an assault with a deadly weapon. The assault presented in the prosecution's theory was the act of shooting Stevens in the head.[1] The two arguments presented virtually the same prosecution theory, that is, Nourn knowingly acted with Barker to kill Stevens. Under the prosecution's theory that Nourn premeditated the murder as a direct aider and abettor, she was not entitled to the defense of duress. As our Supreme Court states in People v. Vieira (2005) 35 Cal.4th 264, 290, 25 Cal.Rptr.3d 337, 106 P.3d 990: "[W]e further reject defendant's argument that duress could negate the requisite intent for one charged with aiding and abetting a first degree murder."

The Majority's Extension Of The Duress Defense To Aiding And Abetting
Not only is the premise of the majority opinion incomplete, but my colleagues create new and debatable if not doubtful law by imposing felony murder theory on aiding and abetting cases. The majority cites People v. Anderson, supra, 28 Cal.4th 767, 122 Cal.Rptr.2d 587, 50 P.3d 368 and People v. Callahan (2004) 124 Cal.App.4th 198, 207, footnote 3, 21 Cal.Rptr.3d 226, for the proposition that duress can be a defense to the underlying felony in the felony murder rule. Citing People v. Anderson and People v. Prettyman (1996) 14 Cal.4th 248, 267-268, 58 Cal.Rptr.2d 827, 926 P.2d 1013, the majority then without critical analysis extrapolates: "We believe the reasoning in Anderson necessarily applies in a like manner to the `natural and probable consequences' theory of accomplice liability. If a defendant is not guilty of aiding and abetting the commission of a predicate or target offense because of duress, he or she cannot be guilty of the crime of murder committed by a confederate on a theory that the murder was a natural and probable consequence of that predicate or target offense." (Maj. opn., pp. 56-57.) Keeping in mind that we are dealing here with whether counsel was ineffective in 2003 for failing to raise the defense my *64 colleagues now create, I have several observations.
The idea that duress applies to the felony underlying the felony murder theory is derived from what appears to be dicta at the end of the opinion in People v. Anderson, supra, 28 Cal.4th at page 784, 122 Cal.Rptr.2d 587, 50 P.3d 368. Anderson was published in July 2002. Nourn was tried in January 2003. Following the Anderson decision, the idea that duress is a defense to felony murder appears as a footnote in People v. Coffman and Marlow (2004) 34 Cal.4th at 99, fn. 31, 17 Cal.Rptr.3d 710, 96 P.3d 30, (Coffman.[2]People v. Callahan, supra, 124 Cal.App.4th 198, 21 Cal.Rptr.3d 226, which is also relied upon by the majority, likewise recites the proposition by way of footnote. (Id. at p. 207, fn. 3, 21 Cal.Rptr.3d 226.) It appears that the Supreme Court first set forth the concept in People v. Wilson (2005) 36 Cal.4th 309, 331, 30 Cal. Rptr.3d 513, 114 P.3d 758. Clearly, Coffman, Callahan and Wilson were decided long after Nourn's trial ended. Whatever may be said about the status of duress as it relates to the underlying felony in the felony murder rule, it was clearly not, in 2003, part of the mainstream of jurisprudence.
My colleagues in any event apply the felony murder duress theory to aiding and abetting. They reason that if duress can be applied to the underlying felony in felony murder then it should apply to the target crime in aiding and abetting. The legal propriety underlying such an extension aside,[3] this certainly was not a theory of law available to Nourn's defense counsel. In fact it appears that no published case, including those cited by my colleagues (i.e., People v. Anderson, supra, 28 Cal.4th 767, 122 Cal.Rptr.2d 587, 50 P.3d 368; People v. Prettyman, supra, 14 Cal.4th at pp. 267-268, 58 Cal.Rptr.2d 827, 926 P.2d 1013; People v. Mendoza (1998) 18 Cal.4th 1114, 1118, 77 Cal.Rptr.2d 428, 959 P.2d 735), has ever extrapolated application of duress as it might apply to the underlying felony of a felony murder case to duress of a target crime in an aiding and abetting context.

The Majority Incorrectly Applies Battered Woman Syndrome To This Case
Having presented an incomplete premise, then having concluded for the first time that duress in felony murder theory applies to aiding and abetting, my colleagues complete their logic by concluding that duress might have been presented to the jury in this case had defense counsel invested more time and energy exploring the battered woman syndrome. The duress they claim existed here was that during their four-month relationship, Barker abused and battered Nourn, causing her to assist him in executing Stevens. Thus defense counsel was ineffective for failure to further explore or make such an argument. There are multiple problems with applying battered woman syndrome to this case.
At the outset, much can be said with respect to whether at the time of Stevens's murder the relationship between Nourn and Barker even qualified as one to which the battered woman syndrome applies. For evidence that battered woman syndrome *65 exists, it must be shown that the person claiming access to the evidence has been physically and psychologically abused for an extended period of time. (People v. Humphrey (1996) 13 Cal.4th 1073, 1083-1084, 56 Cal.Rptr.2d 142, 921 P.2d 1; People v. Gadlin (2000) 78 Cal.App.4th 587, 592, 92 Cal.Rptr.2d 890.) This requirement cannot be met in Nourn's case.
At the time of the murder, Nourn and Barker had been seeing each other for only four months. Barker was married to someone else. He lived not with Nourn but with his wife and child. Although Nourn stayed for several weeks in a garage owned by Barker, she lived with her parents. She was living with her parents at the time of the murder. Moreover, the record does not reflect a clear level of abuse at the time of the murder. There is a serious question as to what abuse, if any, Nourn had been subjected to during the four months she dated Barker. In her taped confession, Nourn said that Barker was controlling, manipulative and possessive but he never hit her prior to the murder and only indirectly threatened her.[4] Making the question of pre-murder battering more difficult to isolate is the fact that neither the experts who have filed declarations in this case nor my colleagues seriously attempt to segregate evidence of battering alleged to have taken place before and at the time of the murder, which would be relevant here, from battering alleged to have taken place during the three years after the murder.[5]
Notably, my colleagues do not mention or address the requirements involved in application of the battered woman syndrome under Evidence Code section 1107. This task is made unnecessary by their conclusion that the battered woman syndrome evidence is available under either Evidence Code[6] section 801 or 1107. For this proposition they rely upon People v. Brown (2004) 33 Cal.4th 892, 16 Cal. Rptr.3d 447, 94 P.3d 574. I do not read Brown quite the same way, particularly since it expressly states: "We therefore do not reach the question whether the expert testimony here was also admissible under section 1107." (Id. at p. 896, 16 Cal. Rptr.3d 447, 94 P.3d 574.) Rather, I read Brown as holding that because the evidence of domestic abuse there, which arguably did not amount to battered woman syndrome, was admissible under section 801, the court did not need to consider its admissibility under section 1107. It appears my colleagues see the battered woman syndrome as any domestic abuse and in doing so confuse the purposes underlying sections 801 and 1107. (See People v. Brown, supra, 33 Cal.4th 892, 16 Cal. Rptr.3d 447, 94 P.3d 574.)
In any event whether Nourn was a battered woman at any point in time does not overcome what I perceive as the most serious defect in the majority's application of battered woman syndrome. Section 1107, subdivision (b), permits admissibility of battered woman syndrome evidence only "if the proponent of the evidence establishes its relevancy." Thus far, battered woman syndrome evidence has been deemed relevant in cases of self-defense (People v. Humphrey (1996) 13 Cal.4th *66 1073, 56 Cal.Rptr.2d 142, 921 P.2d 1) and to explain a battered person's credibility and recantation (People v. Brown, supra, 33 Cal.4th 892, 16 Cal.Rptr.3d 447, 94 P.3d 574; People v. Gadlin (2000) 78 Cal. App.4th 587, 92 Cal.Rptr.2d 890; see also CALCRIM Nos. 8.50, 8.51 which explain these uses). My colleagues now hold the battered woman syndrome is admissible to explain why Nourn murdered not her batterer but an innocent person whose only error was the tragic misfortune of crossing paths with Nourn. There is simply no authority for the majority's current expansion of the battered woman syndrome.
At the end of their logic, my colleagues have turned the battered woman syndrome, a syndrome with the important functions of explaining self-defense and recantation, into a theory of duress which would otherwise not be available in a murder case. I cannot join in the majority's new defense of "the batterer made me do it" and thereby allow what cannot be done directly to be done indirectly.
The problems created by my colleagues' expansion of the battered woman syndrome magnify even further if battered woman syndrome is now to be a theory of duress. My colleagues expressly decline to address whether the requirements of duress are met in this case. Our opinion in Nourn's original appeal (People v. Nourn (May 13, 2004, D041961), 2004 WL 1067532 [nonpub. opn.]), however, concluded they are not met. In light of our previous findings, I am constrained to ask whether the battered woman syndrome evidence is now inadmissible where, as here, there is no immediate threat of death to the battered woman, the battered woman substantially contributed to the creation of the emergency, the battered woman's act is disproportionate to the harm to be avoided, and there was an alternative to committing the murder. (People v. Pepper (1996) 41 Cal.App.4th 1029, 1035, 48 Cal. Rptr.2d 877.) In effect my colleagues may have created an expansion of the battered woman syndrome that is not applicable in this case.
Importantly, this is not a case where defense counsel was ignorant of the battered woman defense. As his declaration explains, he examined and rejected use of the battered woman syndrome. There are understandable reasons why he did so. The facts of this case do not present even the minimal requirements necessary for the defense and no case law existed which permitted use of the syndrome to explain why someone would join forces with an alleged batterer to murder an innocent person.

Sound Defense Tactics Existed
Recently, our Supreme Court reiterated the obligations of appellate courts in reviewing claims of ineffective assistance of counsel: "`"Reviewing courts defer to counsel's reasonable tactical decisions in a claim of ineffective assistance of counsel [citations] and there is a `strong presumption that counsel's conduct falls within the wide range of professional assistance.'" [Citation.] "[W]e accord great deference to counsel's tactical decisions" [citation], and we have explained that "courts should not second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight [citation]." "Tactical errors are generally not deemed reversible, and counsel's decision making must be evaluated in the context of the available facts." [Citation.]'" (People v. Stanley (2006) 39 Cal.4th 913, 954, 47 Cal.Rptr.3d 420, 140 P.3d 736, citing People v. Weaver (2001) 26 Cal.4th 876, 925-926, 111 Cal.Rptr.2d 2, 29 P.3d 103.)
Competent counsel should realistically examine the case, the evidence, and the issues and pursue those avenues of defense *67 that to their best and reasonable professional judgment seem appropriate under the circumstances. (See generally, People v. Freeman (1994) 8 Cal.4th 450, 509, 34 Cal.Rptr.2d 558, 882 P.2d 249; People v. Eckstrom (1974) 43 Cal.App.3d 996, 1002-1003, 118 Cal.Rptr. 391.) Even in a capital case counsel has no blanket obligation to investigate possible "mental" defenses. (People v. Gonzalez (1990) 51 Cal.3d 1179, 1244, 275 Cal.Rptr. 729, 800 P.2d 1159.)
The factual setting facing Nourn's defense counsel was nearly insurmountable. Nourn was accused of horrific and virtually inexplicable crimes. The jury was going to see her two-hour-long videotaped confession. In that confession the jury would hear a detailed description of how Barker and Nourn planned to lure Stevens to his death and the details surrounding his murder. The jury would also hear that the murder occurred in large part because Nourn lied to Barker about Stevens raping her. She described Barker as "controlling, manipulative and possessive." Although he slapped her on the night of the murder when she did not get out of the car and before the murder made her get into the backseat to engage in sexual intercourse, she stated he never hit or hurt her before the night of the murder. She said she was afraid of Barker, but expressly stated he did not make her commit the crimes. Rather, when confronted with Barker's threat he was going to leave her, she agreed to do anything he wanted her to do, including helping to kill Stevens. Significantly, Nourn claimed that while she planned the crimes with Barker, she did not know Barker was actually going to kill Stevens. The jury also saw Barker's videotaped confession which described the murder and Nourn's role in planning it.[7]
Faced with defending the nearly indefensible, defense counsel elected to present a defense consistent with what the jury would hear from Nourn herself in her lengthy confession to the police, namely that she did not premeditate a murder. This decision was tactically realistic and therefore it does not form an adequate basis for reversal by this court.[8]
As previously noted, counsel was not ignorant of the battered woman defense. In his declaration he states he examined its applicability and rejected it as a defense. Given Nourn's confession, this was a legitimate choice to make. Presenting the battered woman defense, even if applicable, would assume Nourn knew but was coerced into helping plan and carry out a murder, or was coerced into a plan to shoot Stevens in the head. Such mental states are in large part inconsistent with lack of knowledge and lack of premeditation. Counsel was not required to offer inconsistent defenses. (People v. Haskett (1982) 30 Cal.3d 841, 853, 868, 180 Cal. Rptr. 640, 640 P.2d 776; see also People v. Weaver, supra, 26 Cal.4th at p. 926, 111 Cal.Rptr.2d 2, 29 P.3d 103; People v. Welch (1999) 20 Cal.4th 701, 728, 85 Cal. Rptr.2d 203, 976 P.2d 754 [where the evidence of guilt is overwhelming counsel properly pursued lack of premeditation rather than actual innocence defense].) Battered woman syndrome was not only a theory generally inconsistent with lack of *68 premeditation, it is a defense that would have required offering specific evidence inconsistent with express statements made by Nourn in her confession. For example, in the confession she stated she was afraid of Barker but he did not make her kill Stevens. Battered woman syndrome would require she claim and explain that he did make her kill Stevens.
The battered woman syndrome defense was not only inconsistent with the defense of lack of premeditation, but the defense would actually help prove the prosecution's case. Defending on the ground Nourn was a battered woman forced to help with either the shooting or more generally the murder assumes she acted with knowledge of Barker's intended purpose, which is the first part of the test demonstrating she aided and abetted Barker. (People v. Mendoza, supra, 18 Cal.4th at p. 1123, 77 Cal.Rptr.2d 428, 959 P.2d 735.)
As he planned Nourn's defense, her counsel was also walking an ethical tightrope. As counsel prepared Nourn for trial, she potentially undermined her entire lack of premeditation defense by telling counsel she did know Barker was going to kill Stevens; acknowledging she had lied in her taped confession to the police, to her previous counsel and to him. These multiple lies were in addition to the fact that she unquestionably instigated Stevens's murder by lying to Barker the morning of the killing, telling him Stevens raped her, then admitting immediately after the brutal killing and arson that she had lied about the rape. Because presenting a battered woman defense might require Nourn testify, counsel could be justifiably concerned with whether his client would tell the truth under oath and whether true information would be given to experts who might testify.
My colleagues and experts who filed declarations for this court's consideration appear to urge defense counsel should have ignored whether Nourn would tell them the truth and divulge to them the confidential statements she made to counsel, i.e., that she did know the purpose was to kill Stevens. I would resist the temptation to suggest to an attorney that it is not only permissible but somehow required that he or she ignore what might be a client's proclivity to lie, perhaps to the very experts counsel would be looking to for assistance. How such a client is handled must be left to the sound judgment of counsel preparing for trial. Attorneys owe no duty to their clients to offer testimony that is not true. (People v. Riel (2000) 22 Cal.4th 1153, 1215, 1218, 96 Cal.Rptr.2d 1, 998 P.2d 969.) Although an attorney may ethically present evidence he suspects but does not know is false, he may not present evidence he knows to be false or assist in perpetrating known frauds on the court. Presenting such evidence may raise difficult tactical decisions but as long as the record reflects counsel appreciated the difference there is no basis to conclude he acted as other than a diligent advocate. (Id. at p. 1218, 96 Cal.Rptr.2d 1, 998 P.2d 969.) Defense counsel clearly appreciated the difference.
Even assuming counsel could deal with Nourn's potential lack of candor to the experts, the problem facing counsel was that his client was potentially a loose cannon. Putting her on the stand and subjecting her to cross-examination was a roll of the proverbial dice, the result of which might result in complete obliteration of the best defense she had, the one consistent with the evidence, namely, that she did not premeditate any murder. Undoubtedly, any experts testifying on Nourn's behalf would be challenged with respect to the effect of truthfulness or lack thereof on their opinions. Defense counsel is not ineffective for failing to offer evidence where *69 there is no reasonable possibility that evidence will help the defense and carries a risk of devastating cross-examination. (People v. Mayfield (1993) 5 Cal.4th 142, 207, 209, 19 Cal.Rptr.2d 836, 852 P.2d 331; In re Ross (1995) 10 Cal.4th 184, 213, 40 Cal.Rptr.2d 544, 892 P.2d 1287 [damaging impeachment and rebuttal evidence possible with adverse effect on trial strategy].)
Counsel's goal was to offer the defense Nourn would present to the jury in her taped confession. In the process, counsel could insulate her from cross-examination, minimize any harm to her and put her in the best light he could. He selected a course of defense designed to accomplish these goals. This course of defense was reasonable, and therefore I do not believe we are permitted to find counsel ineffective. This conclusion is not altered because with hindsight three years after the trial we can see there might be a new and different defense.

There Was No Prejudice
I do not find prejudice in the failure to present duress as a battered woman defense. Evidence that would be admitted under battered woman syndrome was before the jury. From the evidence adduced at trial in the form of Nourn's confession to the police, defense counsel argued that Nourn was abused by Barker. He described her to the jury as "a kid," a victim of an Internet predator who forcibly raped her and hit her in the car on the night of the murder. He told the jury that Barker abused, controlled and manipulated Nourn's behavior and that Barker threatened to kill her if she told anyone about the murder. He described Nourn's mental and physical condition at the time of the murder as scared and abused. He argued all of this resulted in a mental state that prevented her from thinking clearly or premeditating. At peril of admonition from the court, which he received, counsel also expressly argued Nourn acted under duress.
There was overwhelming evidence Nourn planned and participated in murdering Stevens and committing arson. There was undisputed evidence that the lie she told Barker concerning her alleged rape by Stevens instigated the murder. There was also overwhelming and undisputed evidence she could have taken action at multiple points in time when she was alone with Stevens to warn him, and prevent his death. The jury, which deliberated approximately three hours, one of those hours reserved for lunch and additional time taken with a question, flatly rejected the explanation that Nourn acted under the influence of Barker. It held her responsible for her own choices and her own actions. There is no reason to believe that the explanation she offered would have been more acceptable to the jury if she claimed in trial to be a battered woman after telling the police in the taped confession that she was not.
There is no reasonable probability that presenting a defense of duress through the battered woman syndrome would have resulted in a more favorable verdict for Nourn.

Conclusion
With all due respect, my colleagues find Nourn's trial counsel ineffective for not being creative enough to find a way to offer a duress defense. The route they offer to such a defense is, however, new to jurisprudence and respectfully, in many respects is untenable. There is not a sufficient basis to find counsel ineffective and report him to the state bar.[9] Counsel *70 offered a reasonable defense of lack of premeditation. I would therefore deny the writ relief requested.
McINTYRE, J., concurs.
NOTES
[1] Although Evidence Code section 1107 was amended as of January 1, 2005, to use the phrase "intimate partner battering" instead of "battered women's syndrome," we use the more traditional term "BWS" even though that label is misleading because it appears to limit that syndrome to women. A victim of BWS can be either a male or female.
[2] For consistency in describing the general factual background, we repeat, mostly verbatim, the factual description set forth in our opinion in People v. Nourn (May 13, 2004, D041961), 2004 WL 1067532 [nonpub. opn.] (Nourn), in which on appeal we affirmed Nourn's two convictions, but reversed the jury's true finding on the special circumstance allegation of lying in wait (Pen.Code, § 190.2, subd. (a)(15)). On March 24, 2006, Nourn filed a request that we take judicial notice of the court docket, record, and files in her trial in San Diego County Superior Court Case No. SCD163772 and in her appeal to this court in Case No. D041961. We grant that request.
[3] In accordance with the prosecutor's sole theory of Nourn's liability, the trial court instructed with a modified version of CALJIC No. 3.02, which provided in part: "In order to find [Nourn] guilty of the crime of murder, as charged in Count One, you must be satisfied beyond a reasonable doubt that: [¶] 1. The crime of assault with a deadly weapon or by means of force likely to produce great bodily injury or with a firearm was committed; [¶] 2. That [Nourn] aided and abetted that crime; [¶] 3. That a co-principal [i.e., Barker] in that crime committed the crime of murder; and [¶] The crime of murder was a natural and probable consequence of the commission of the crime of assault with a deadly weapon or by means of force likely to produce great bodily injury or with a firearm. [¶] You are not required to unanimously agree as to which originally contemplated crime [Nourn] aided and abetted, so long as you are satisfied beyond a reasonable doubt and unanimously agree that [Nourn] aided and abetted the commission of an identified and defined target crime and that the crime of murder was a natural and probable consequence of the commission of that target crime...."
[4] The trial court instructed: "[I]t is no defense to the charge of murder that [Nourn] claims she committed any act charged, or made any of the omissions charged, under threats or menaces. The defense that [Nourn] acted under threats or menace sufficient to show she had reasonable cause to believe, and did believe, that her life would be endangered if she refused, is not available."
[5] "A crucial defense is not necessarily one which, if presented, `would result inexorably in a defendant's acquittal.' [Citations] [People v. Ibarra (1963) 60 Cal.2d 460, 34 Cal. Rptr. 863, 386 P.2d 487] itself teaches that by failing to obtain an adjudication of the stronger of two potential defenses, trial counsel deprived his client of constitutionally adequate assistance. [Citation.]" (People v. Pope, supra, 23 Cal.3d at p. 425, fn. 15, 152 Cal.Rptr. 732, 590 P.2d 859.)
[6] All further statutory references are to the Evidence Code unless otherwise specified.
[7] Section 801 provides: "If a witness is testifying as an expert, his [or her] testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his [or her] special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him [or her] at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his [or her] testimony relates, unless an expert is precluded by law from using such matter as a basis for his [or her] opinion."
[8] Dr. Friedman's psychological evaluation was conducted after our remittitur to the trial court on issuance of our opinion in Nourn, supra, D046347. She was hired by attorney Douglas Brown, Nourn's counsel on remittitur. Dr. Friedman's evaluation, together with other reports and information, apparently influenced the prosecution to not pursue the special circumstance allegation of lying in wait.
[9] Dr. Mechanic's evaluation was conducted after our remittitur to the trial court on issuance of our opinion in Nourn, supra, D046347. She also was hired by Brown, Nourn's counsel on remittitur. Her report, together with other reports and information, apparently influenced the prosecution to not pursue the special circumstance allegation of lying in wait.
[10] Dr. Wexler's evaluation was conducted after our remittitur to the trial court on issuance of our opinion in Nourn, supra, D046347. He apparently was hired by the prosecution. His report, together with other reports and information, apparently influenced the prosecution to not pursue the special circumstance allegation of lying in wait.
[11] Unlike the reports of Drs. Friedman, Mechanic, and Wexler, Dr. Kaser-Boyd's report was conducted after the trial court denied Nourn's petition for writ of habeas corpus. Her report was prepared and submitted to support Nourn's instant amended petition for writ of habeas corpus.
[12] Dr. Kaser-Boyd was a research assistant to Dr. Lenore Walker, whose work was the origin of BWS theory. (People v. Brown, supra, 33 Cal.4th at p. 899, 16 Cal.Rptr.3d 447, 94 P.3d 574.)
[13] Barker also was attempting to arrange a "hit" on Carlos, Nourn's defense counsel at the time.
[14] Brown stated that his review of Nourn's case files did not show Nourn had been evaluated by a psychologist, psychiatrist, or domestic violence expert prior to his hiring of Dr. Friedman.
[15] In Ulibarri's declaration, she states that during her meeting with Cormicle, he told her he became Nourn's retained counsel after Carlos received a death threat from Barker and declared a conflict of interest.
[16] According to the declarations of Ulibarri and Stralla, Cormicle told them he understood Nourn's relationship with Barker was an abusive one.
[17] We also note that one factor in determining whether a counsel's decision not to investigate a particular issue should be the degree of that counsel's particular experience or familiarity with that issue. In this case, trial counsel admitted he had never tried a BWS case. Absent BWS experience, it was unreasonable for him to unilaterally conclude, as a non-BWS psychologist or other expert, that any investigation into a possible BWS, mental state, or duress defense was unwarranted or that any such defense would have conflicted or been inconsistent with the defense he presented at trial.
[18] In Brauer's declaration, she states: "[Cormicle's] assumption that [Nourn] would have told an expert of her disclosure to [him], in my opinion, is based on pure speculation. Based on my review of the materials and [Cormicle's] declaration, it appears [Nourn] had not made this type of disclosure to anyone else prior to her alleged disclosure to [Cormicle]. Therefore, in my opinion, this seriously undermines [Cormicle's] conclusion that [Nourn] would have disclosed these statements to an expert."
[19] To the extent trial counsel would have presented at trial the testimony of a BWS expert to whom Nourn had not disclosed those statements, he could have avoided any possible ethical dilemma by posing hypothetical questions to that expert, as Shudde suggests in her declaration. Similarly, to the extent trial counsel may have decided against having Nourn testify at trial because he feared he might suborn perjury, there are alternative methods of allowing Nourn to testify without posing an ethical dilemma, including having her testify in the narrative form or his substituting out of the case. (See, e.g., People v. Jennings (1999) 70 Cal.App.4th 899, 907-908, 83 Cal.Rptr.2d 33; People v. Johnson (1998) 62 Cal.App.4th 608, 620-630, 72 Cal.Rptr.2d 805.) The People do not show or argue to the contrary.
[20] Brauer states: "I am aware that [Cormicle] opted not to present an expert at [Nourn's] trial strategically deciding that [Nourn's] best defense was her version of the events stated to San Diego police and not the alleged disclosure [Nourn] made to Cormicle within the attorney-client relationship. [¶] However, counsel's decision simply doesn't make any tactical sense." Brauer explained: "While counsel may have reasonably believed that [Nourn's] confession to police presented the jury with a more sympathetic version of her side of the case, defense counsel left the jury literally no evidence to `hang its hat on' in [Nourn's] favor. [¶] In my opinion, with a BWS defense, the jury would have understood [Nourn's] conduct prior to and after the homicide. Without such a defense, the jury had no choice but to convict [Nourn]."
[21] The People argue that the declarations submitted by Nourn are not "dispositive" of the issue of whether her counsel performed deficiently. However, Nourn's burden is not to present "dispositive" proof, but rather proof by a preponderance of the evidence that her counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. (People v. Ledesma, supra, 43 Cal.3d at p. 218, 233 Cal.Rptr. 404, 729 P.2d 839.) She has met that burden. Furthermore, we note the People have not submitted any declarations or other evidence to contradict the expert declarations and other evidence submitted by Nourn in her appendix to the petition.
[22] Penal Code section 31 defines "principals" in the commission of a crime as: "All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission. ..."
[23] Erickson stated: "While [BWS] testimony has been held admissible to explain how the defendant's asserted subjective perception of a need to defend herself `would reasonably follow from the defendant's experience as a battered woman' [citation], an expert is not permitted to testify as to the expert's opinion that the defendant actually perceived that she was in danger and needed to defend herself [citation]." (People v. Erickson, supra, 57 Cal. App.4th at p. 1400, 67 Cal.Rptr.2d 740.)
[24] Penal Code section 29 provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." Neither Penal Code section 28 nor section 29 would entirely (or even significantly) preclude expert testimony on BWS in general or how its effects relate to the hypothetical (or actual) circumstances in Nourn's situation.
[25] To the extent the jury instructions supported and the jury found Nourn guilty of first degree murder based on her direct participation in Stevens's murder, rather than her aiding and abetting Barker's assault on Stevens, despite the prosecutor's sole "natural and probable consequences" theory of accomplice liability, we conclude there is strong evidence that could have been obtained and presented at trial to support a finding that it was not proven beyond a reasonable doubt that Nourn had the requisite specific intent and/or premeditation and deliberation for first degree murder.
[26] That more favorable result could have consisted of at least a hung jury on either of the charges against her (i.e., first degree murder or arson).
[1] The record reflects the prosecution argued to the jury: "The assault that we are talking about in this case, is an assault with a deadly weapon, or firearm, or by means of force likely to produce great bodily injury. [¶] Putting a gun to someone's head is an assault. It is an assault with a deadly weapon. It is an assault with a firearm. It is an assault by force likely to produce great bodily injury. Putting a gun to someone's head is all of these things." "And you need to find that murder is a natural and probable consequence of assaulting someone with a firearm, a deadly weapon. Putting a gun to someone's head and pulling the trigger is a natural and probable consequenceor murder, rather, is a natural and probable consequence of putting a gun to someone's head." The prosecutor also argued: "[S]he set up David Stevens to be assaulted, shot and killed. That's what she did." More fully examined, the prosecution's theory was that Nourn planned and premeditated the murder with Barker and she planned the assault of shooting Stevens in the head, knowing he would undoubtedly die.
[2] The footnote in Coffman refers to the language in Anderson as a holding.
[3] One is constrained to ask whether, for example, the merger doctrine applicable in felony murder law is equally applicable to my colleagues' new legal theory. That doctrine prohibits the use of the felony murder rule where, as here, an assault is an integral part of the murder. (People v. Ireland (1969) 70 Cal.2d 522, 540, 75 Cal.Rptr. 188, 450 P.2d 580; People v. Wilson (1969) 1 Cal.3d 431, 440, 82 Cal.Rptr. 494, 462 P.2d 22.)
[4] The transcript of the videotaped confession was marked court's Exhibit No. 24a. It appears in the clerk's transcript.
[5] Even the experts whose declarations appear in the petition before us are inconsistent in their conclusions that Nourn was assaulted the night of the murder. Dr. David Wexler appears to conclude she was not. Dr. Meredith Friedman concludes she was. Any application of the battered woman defense is thus factually as well as legally problematic.
[6] All further statutory references are to the Evidence Code unless otherwise specified.
[7] Barker's confession was admitted into evidence as Exhibit Nos. M1-M2.
[8] This tactic may have helped Nourn. For example, in her taped confession Nourn insisted Barker fired only one shot at Stevens's head. Barker countered that Nourn fired a shot and he fired a second shot. The coroner agreed with Barker that two shots were fired. Nourn might well have had to explain aloud the discrepancy, as might any experts on battered woman syndrome called upon to vouch for her veracity. As it was, the jury concluded Nourn was not armed with a handgun at the time of the murder.
[9] Business & Professions Code section 6086.7, subdivision (a)(2), requires the court report incompetence of counsel to the state bar whenever it results in reversal or modification of a judgment in a judicial proceeding.